**In re Rosa Lee JERNIGAN, Debtor.**

**Bankruptcy No. 89–00045–W.**

United States Bankruptcy Court,
N.D. Oklahoma.

Aug. 14, 1991.

As Amended Oct. 11, 1991.

Tom Wagenblast, Suite B, Tulsa, Okl., for debtor.

Catherine O'Leary, Tulsa, Okl., for creditor McDonnell Douglas Federal Credit Union.

Lonnie Eck, Trustee.

## ORDER DENYING CONFIRMATION OF PLAN AND CONTINUING MOTION TO DISMISS

MICKEY DAN WILSON, Bankruptcy Judge.

On August 23, 1989, the Court held a hearing on confirmation of a Ch. 13 plan in the above-styled case, and entertained objection thereto pursuant to Bankruptcy Rule 3020(b); thereafter, the matter was taken under advisement. Upon consideration of the record herein, the Court, pursuant to Bankruptcy Rules 7052 and 9014, finds, concludes, and orders as follows.

### FINDINGS OF FACT

The facts of this case may be summarized as follows. Debtor formerly worked for General Motors, but her employment by them ceased under circumstances which caused her to sue General Motors. General Motors won a jury verdict, and thereafter was awarded attorney fees of over $25,000; but debtor dodged notice of General Motors' judgment. Meanwhile, debtor was re-employed by McDonnell–Douglas; and she borrowed some $13,000 from her new employer's Credit Union to buy a new Ford pickup truck, even though she already

owned two other, less valuable motor vehicles. Debtor gave Credit Union a security interest in her new truck, which Credit Union perfected two weeks after the date of the loan. Just as Credit Union was perfecting its lien, General Motors garnished debtor's paycheck, causing debtor to flee into bankruptcy. Debtor did not attempt to simply shed her debts under 11 U.S.C. Chapter 7 ("Ch. 7"), but rather filed bankruptcy under 11 U.S.C. Chapter 13 ("Ch. 13") and proposed to repay some portion of her debts from her future income pursuant to a plan. But debtor's proposed plan takes advantage of an accident in timing of Credit Union's perfection of its lien, and would use bankruptcy law to cancel or avoid the lien and enable debtor to keep the new truck while paying Credit Union only a fraction of the truck's purchase price or resale value. Credit Union objects to confirmation of this plan. While the matter remained under advisement, debtor made the payments proposed in her unconfirmed plan to the Trustee, who has in turn paid these monies over to debtor's creditors. Detailed facts are as follows, in the order in which they presented themselves to this Court.

On January 11, 1989, Rosa Lee Jernigan ("debtor") filed her petition for relief under 11 U.S.C. Ch. 13 in this Court. The case came under the supervision of Lonnie D. Eck, who has been appointed, pursuant to 11 U.S.C. § 1302(a), 28 U.S.C. § 586(b), as standing trustee ("the Trustee") in Ch. 13 cases in this District.

Debtor works as a "Facilitator" for McDonnell Douglas Corp., at a salary of $23,400 per year, Statement of Affairs ¶ 2a, b, Ch. 13 Statement ¶ 2a, b. Debtor's budget indicates gross wages of $450 per week; payroll deductions of $128 per week (including $5 per week for "Charity"); and take-home pay of $266 per week or $1,200 per month. These figures appear somewhat inaccurate. Debtor's stated weekly gross wages equal slightly more than $1,800 per month or a total of only $22,500 per year (not $23,400 per year); her stated weekly gross wage of $450 per week minus deductions of $128 per week equals take-home pay of $322 per week (not $266 per

week), which is slightly more than $1,288 per month (not $1,200 per month), Ch. 13 Statement ¶ 2f. Debtor's budget further indicates expenses of $840.58 per month, Ch. 13 Statement ¶ 4b. The exact "excess of … income … over … expenses" called for in Ch. 13 Statement ¶ 4c is not correctly stated by debtor on her form, but should equal $359.42. This amount is closely approximated by the "Total amount to be paid each month under plan" of $350, Ch. 13 Statement ¶ 4d.

Debtor's Ch. 13 Statement reported no priority debts, although debtor commented "Rec'd past due property tax bill but I don't owe it—was paid to owner of property," Ch. 13 Statement ¶ 12a; secured debts totalling $26,935.99 secured by collateral valued at $95,530, Ch. 13 Statement ¶ 12b, ¶ 14; and unsecured debts totalling $32,-723.95, Ch. 13 Statement ¶ 12c. The secured debts included a debt of $3,954.96 owed to Anest Development Corp. on a contract for deed on debtor's home valued at $28,000; a debt of $5,333.23 owed to Ford Motor Credit Corp. ("FMCC"), paid in installments of $135.99, presumably per month, and secured by a 1988 Yugo automobile valued at $3,000; and a debt of $17,647.80 owed to McDonnell Douglas Federal Credit Union ("Credit Union") secured by a 1989 Ford pick-up valued at $9,500. The unsecured debts included a "Judgment" in favor of Central Foundry Division, General Motors Corp. ("General Motors") for $25,265.60; a debt for "Personal loan" owed to Almeta Johnson in the amount of $5,000; a debt for "Medical" owed to Hillcrest Medical Center in the amount of $1.578.25; and miscellaneous debts owed to five other creditors totalling $880.10, of which $186.45 was "disputed," Ch. 13 Statement ¶ 12c.

Besides the above-mentioned items of property, debtor's Ch. 13 Statement reported her ownership of a 1964 Chevrolet pick-up valued at $200; household goods valued at $2,500; personal effects including one "38 S & W" valued at a total of $2,120 (or perhaps $2,240); cash of $50; checking account of $160; and "claim[s]" against General Motors for "Workers Comp." and "dis-

crimination," said to be of "unknown value" but estimated together at a value of $50,000, Ch. 13 Statement ¶ 14b, Schedule B–4.

All of debtor's property described in the two preceding paragraphs, except the 1988 Yugo and 1989 Ford pickup, was claimed as exempt, Schedule B–4.

Debtor also reported holding $519 belonging to one Leola Robinson, which sum was "deposited in checking account to pay invalid mother's debts from social security checks," Statement of Affairs ¶ 6.

Debtor's attorney filed a "Statement of Attorney's Compensation" which, although not perfectly clear, appears to report that debtor paid or promised a total attorney fee for work in this case of $950, of which $125 was paid down by debtor, $500 was "paid by Leola Robinson," and "the rest to be paid in plan."

Debtor reported her involvement in three lawsuits within the year preceding the filing of her Ch. 13 case, all three against General Motors, and one of them, in the District Court for Tulsa County, producing a "Notice of Garnishment" against debtor and in favor of General Motors, "Demand amount of $25,265.60 (plus costs)," date not stated, Statement of Affairs ¶ 10, Ch. 13 Statement ¶ 9b.

On February 8, 1989, Credit Union filed its "Proof of Claim" herein, as a secured claim in the amount of $13,507.38 secured by a "Motor Vehicle." Later, on September 5, 1989, Credit Union filed another "Proof of Claim" herein, not designated "Amended," but apparently intended only to add certain documentation to that appended to the earlier "Proof of Claim." Documents appended to these proofs of claim showed that debtor had borrowed $13,507.38 from Credit Union on December 22, 1988, less than three weeks before debtor filed for bankruptcy under Ch. 13; that collateral for the loan was a 1989 Ford Supercab XLT; that a security agreement was executed on or about January 3, 1989; and that a lien entry form dated "12/22/88" was submitted to an Oklahoma motor license agent on January 5, 1989.

On February 22, 1989, Nadine Thoos, Creek County Treasurer, filed her "Proof of Claim" herein, for priority payment of $509.02 in "unpaid Personal Property taxes" for the years "1986, 1987 and 1988."

On February 23, 1989, General Motors filed its "Proof of Claim" herein, showing such claim to be based on an "original judgment ... in the amount of $25,265.50" which was reduced by "Amount received from garnishment [of] $82.68" for a net "Balance owing [of] $25,182.82." Copies of documents attached to said proof of claim show that the claim arose in a lawsuit by debtor against General Motors in the Circuit Court for the County of Saginaw, State of Michigan; that debtor's action against General Motors was defeated when a "jury ... rendered its verdict of no cause of action against [General Motors], based on its concluding [General Motors] had not discriminated against [debtor] on the basis of her race, color or sex;" and that thereafter the Circuit Court for the County of Saginaw, State of Michigan, ordered debtor to pay General Motors' attorney fees in the amount of $25,265.50.

On February 7, 1989, debtor filed her "Chapter 13 Plan." On February 24, 1989, Credit Union filed its objection to debtor's plan. Hearing on confirmation of said plan was scheduled for March 1, 1989. This hearing was continued to March 17, 1989. On March 14, shortly before the hearing, Credit Union withdrew its objection, for unstated reasons. The hearing on March 17, 1989 was continued, evidently to no definite date, to allow for "Amendments to be filed on or before March 28, 1989," see minute dated March 17, 1989.

On March 28, 1989, debtor filed her "Amended Chapter 13 Plan." The amended plan proposed, first, to continue payments to Anest Development Corp. on debtor's home pursuant to the terms of the contract for deed "without paying through the Trustee," amended plan p. 3, in a manner described in bankruptcy shop talk as "outside the plan." The amended plan further proposed that debtor would make 36 monthly payments to the Trustee, the first two payments of $350 each, the remainder

of $429.19 each, each payment to be distributed among creditors as provided in the plan. Administrative and priority claims would be paid as follows: no provision was made for payment of the Trustee's commission; $41.50 of each of the first ten payments, totalling $415, would be paid to debtor's attorney; and $14.14 of the first thirty-five payments, plus a final payment of $14.10, totalling $509, would be paid to the Creek County Clerk. No payments would be made on secured claims, for the following reasons: as noted above, payments on debtor's home would continue as usual "outside the plan;" as for debtor's vehicles, "The 1988 Yugo which is security to FMCC shall be surrendered in full payment of such debt," while

> The McDonnell Douglas Federal Credit Union debt secured by debtor's 1989 Ford pickup is relegated to unsecured status because the lien entry form was filed after 10 days from the date of the transaction through which the Credit Union received its collateral and within 90 days of the filing of the petition herein and therefore [is] avoidable as a preference under 11 U.S.C. § 547,

amended plan p. 3. Unsecured claims would be paid pro rata from the balance of each monthly payment, which "should pay approximately 26% on general allowed unsecured non-priority claims," amended plan p. 4. In addition thereto, "Any amount received on the workers' compensation or the discrimination claims against General Motors is to be paid to the Trustee for distribution to the allowed unsecured claims," amended plan p. 3.

On March 31, 1989, debtor filed an "Amendment to Chapter 13 Statement," which amended her original budget to increase take-home pay to $1,428.77 per month, increase expenses to $999.58 per month, correctly show an "excess of ... income ... over ... expenses" of $429.19 per month, and provide for "Total amount to be paid each month under plan" of $429.19.

Hearing on confirmation was rescheduled for August 23, 1989. At said hearing, Credit Union appeared by its attorney and interposed a renewed objection to confirmation of the plan, asserting, among other things, lack of notice of the amended plan; evidence was introduced and received; and thereafter, the matter was taken under advisement. On September 5, 1989, Credit Union filed its "Objection To The Amended Chapter 13 Plan, Or In The Alternative, Motion to Dismiss," and a "Brief ... In Support ..." thereof; while debtor filed her "Brief In Favor Of Debtor's Chapter 13 Plan Being Confirmed Allowing Debtor To Use Trustee's Avoiding Powers Under 11 U.S.C. Sections 544 And 547." With the filing of these documents, the matter under advisement became ripe for decision.

As noted above, debtor values the Ford truck at $9,500. Credit Union asserts that

> In December, 1988, Debtor paid $12,900.00 for the vehicle. The current N.A.D.A. book value of the vehicle is $13,550.00. Assuming that the vehicle has depreciated, on the high end, some $2,000.00, it could sell for approximately $11,550.00,

Credit Union's brief p. 11. Book value notwithstanding, the Court sets the upper limit of the vehicle's value at the price debtor paid for it, i.e. $12,900.00; and determines that, at the time this matter was taken under advisement, the Ford truck would sell for $10,500.00.

The Court adopts the following statements by Credit Union, which appear to be uncontested by debtor and are supported in part by Credit Union's "Proof[s] of Claim" filed herein on February 8, 1989 and on September 5, 1989, as additional findings of fact:

> On December 22, 1988, [debtor] made an application to ... Credit Union ... for a loan for the purchase of a 1989 Ford Pickup in the sum of $12,900.00. Additional sums for credit disability ($582.38) and lien fee ($25.00) brought [Credit Union's] claim to $13,507.38. To date, no payments have been made on this loan.

> On December 22, 1989 [Credit Union] approved the loan application, and issued a check payable to [debtor] and Fred Jones Ford for payment in full of the 1989 Ford Pickup.

On January 5, 1989, [Credit Union] filed its lien entry form with tag agent, some fourteen (14) days after the purchase of the vehicle. Oklahoma law provides that a lien is perfected as of the date of sale if filed within (10) days of the purchase of said vehicle. See 47 O.S. § 1110. It is undisputed ... that [Credit Union's] lien was perfected on January 5, 1989.

. . . . .

The first meeting of creditors was held on February 21, 1989, and the Trustee at that time declined to approve the claim of [Credit Union], but also declined to take any adverse action on [Credit Union's] claim.

. . . . .

... the original Chapter 13 Statement filed by [debtor] contained a number of inaccuracies ...

... Debtor valued her income some $228.77 less than that actually received by [her]. When this was brought to the Court's attention, [debtor] indicated that some of her expenses were actually more than those listed in the Chapter 13 Statement. Instead of laundry and cleaning costing her $15.00, she testified that it really cost her $45.00. Instead of newspapers, periodicals and books costing her $0.00, she testified that they really cost her $19.00. Instead of medical and drug expenses costing her $0.00, she testified that they really cost her $60.00. Instead of transportation costing her $80.00, she testified that it cost her $130.00.

These changes increased her expenses by $159.00 not previously reported.

. . . . .

[General Motors] filed [its] foreign judgment in Tulsa District Court, Case No. CJ–88–6895, on November 23, 1988. The record reflects the Notice of Filing Foreign Judgment and an Affidavit of Mark Dixon was mailed to Rosa Jernigan at Route 2, Box 1332, Mannford, Oklahoma 74144 certified, return receipt requested. The letter was returned unclaimed after attempts at delivery were made on November 25, 1988; November 28, 1988; and November 30, 1988.

Again, the record reflects the Notice of Filing Foreign Judgment and an Affidavit of Mark Dixon was mailed to Rosa Jernigan at Route 2, Box 1332, Mannford, Oklahoma 74144 certified, return receipt requested. The letter was returned unclaimed after attempts at delivery were made on November 26, 1988; December 1, 1988; and December 11, 1988. . . .

The first garnishment was issued by the Tulsa Court Clerk on December 21, 1988, naming McDonnell Douglas Corporation as garnishee. It was delivered December 28, 1988. The garnishee answered on January 3, 1989, paying $83.52 over to the judgment creditor,

Credit Union's brief pp. 1–2, 7–8, 10–11.

On February 14, 1991, the Trustee filed a "Report ..." advising the Court that debtor had paid a total of $11,737.18, including several tax refunds, to the Trustee pursuant to the provisions of the yet-unconfirmed plan. On February 19, 1991, the Court issued its "Order for Preconfirmation Disbursements," which determined that said sum "should be utilized to make prorata dividends to the holders of allowed unsecured claims in this case" and that

the claim of McDonnell Douglas—Tulsa Federal Credit Union should be treated for purposes of preconfirmation disbursements as an unsecured claim without priority in the sum of $13,507.38, without prejudice to the rights of said creditor

and directed payment as follows:

| PAYEE | AMOUNT OF DISBURSEMENT |
|---|---|
| Lonnie D. Eck, Trustee (Trustee's present percentage fee) | $1,173.72 |
| T.H. Wagenblast (Attorney fees $41.50 × 10) | 415.00 |
| Creek County Clerk ($14.14 × 24) | 339.36 |
| McDonnell Douglas–Tulsa Federal Credit Union | 3,420.29 |
| General Motors Corporation | 6,376.71 |
| J.C. Penney Company, Inc. | 12.10 |

Any "Conclusions of Law" which ought more properly to be "Findings of Fact" are adopted and incorporated herein by reference.

## CONCLUSIONS OF LAW

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (K), (L), 11 U.S.C. §§ 103, 323, 522, 544, 547, 1302, 1303, 1325.

This contested matter under Bankruptcy Rule 3020(b) revolves around a single provision in debtor's proposed Ch. 13 plan—i.e., that Credit Union's debt of $13,507.38 secured by debtor's Ford pickup truck valued by debtor at $9,500

> is relegated to unsecured status because the lien entry form was filed after 10 days from the date of the transaction through which the Credit Union received its collateral and within 90 days of the filing of the petition herein and therefore [is] avoidable as a preference under 11 U.S.C. § 547.

The Court notes that Credit Union's loan to debtor was made on December 22, 1988; that the lien entry form by which Credit Union sought to perfect its security interest in debtor's Ford pickup as collateral for the loan was dated December 22, 1988; that the security agreement itself was dated January 3, 1989; and that the lien entry form was delivered to an Oklahoma motor license agent on January 5, 1989, fourteen days after the date of the loan and lien entry form, but only two days after the date of the security agreement, which in turn was executed twelve days after the date of the loan. For purposes of this opinion, the Court presumes that Credit Union's perfected security interest in debtor's Ford pickup truck may be avoided and Credit Union's debt relegated to unsecured status pursuant to 11 U.S.C. §§ 544, 547, as a result of Credit Union's failure to perfect its security interest by delivery of the lien entry form within ten days of the date thereof, 11 U.S.C. § 547(c)(3)(B), (e)(2)—but see 47 O.S. § 1110(A)(2). The Court makes this assumption because Credit Union does not argue the merits of perfection and preference here. Rather, Cred-

it Union objects to *this debtor's* attempt to avoid its perfected security interest, on several grounds peculiar to proceedings in Ch. 13. Credit Union asserts that debtor's Ch. 13 plan cannot be confirmed under 11 U.S.C. § 1325(a)(3), (4), which provide as follows:

> (a) ... the court shall confirm a plan if—
>
> . . . . .
>
> (3) the plan has been proposed in good faith and not by any means forbidden by law;
>
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date ...

The question is not whether the security interest is avoidable, but whether (assuming the security interest is avoidable) the plan is confirmable.

Credit Union argues, first, that debtor's plan proposes "means forbidden by law" in violation of 11 U.S.C. § 1325(a)(3). The plan would have debtor avoid Credit Union's perfected security interest pursuant to 11 U.S.C. §§ 544, 547. Credit Union argues that these avoiding powers are properly used by the Trustee alone; that the Ch. 13 Trustee herein has failed or refused to use them; and that, as a matter of law, debtor cannot use those powers in the Trustee's stead.

By invoking §§ 544, 547 to reduce a perfected secured claim to unsecured status, debtor seeks to determine the validity, priority or extent of Credit Union's lien. Such determination should be made by filing a complaint commencing an adversary proceeding, Bankruptcy Rule 7001(2). In some instances, defendants in such proceedings may be entitled to jury trial, *Granfinanciera v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), although not in this particular instance where Credit Union has filed claims, *Langenkamp v. Culp*, —— U.S. ——, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). Such impor-

tant requirements and rights should not be short-cut by the procedural device of embedding the matter in a Ch. 13 plan. To this extent, at least, the plan does "propose ... means forbidden by law" and should not be confirmed. However, such procedural defect is easily cured. The Court cannot rest its decision here, but must proceed to consider the real gist of Credit Union's objection, which involves debtor's right to use a power and not merely the procedural method of its use.

■ 11 U.S.C. § 303(a) makes 11 U.S.C. Chapter 5 applicable to cases under Ch. 13. This means that the so-called "Trustee's avoiding powers" set forth in 11 U.S.C. §§ 544–550 should be available in Ch. 13. The question is who will use them. Some courts have held that such "Trustee" powers must be used by the Trustee alone, *In re Carter*, 2 B.R. 321 (Bankr.D.Col.1980), *In re Walls*, 17 B.R. 701 (Bankr.S.D.W.Va. 1982); or are available to debtors only in certain narrow circumstances prescribed by 11 U.S.C. § 522(g), (h), (i), *In re Driscoll*, 57 B.R. 322 (Bankr.W.D.Wis.1986), *In re Mast*, 79 B.R. 981 (Bankr.W.D.Mich.1987). Other courts have held that such powers may be used by Ch. 13 debtors even beyond the limits of § 522, *In re Hall*, 26 B.R. 10 (Bankr.M.D.Fla.1982), *In re Boyette*, 33 B.R. 10 (Bankr.N.D.Tex.1983), *In re Carr*, 34 B.R. 653 (Bankr.D.Conn.1983), *In re Einoder*, 55 B.R. 319 (Bankr.N.D.Ill.1985), *In re Freeman*, 72 B.R. 850 (Bankr.E.D.Va. 1987). At least one court has held that a Ch. 13 debtor can even veto a Trustee's use of "Trustee's" avoiding powers, *In re Ciavarella*, 28 B.R. 823 (Bankr.S.D.N.Y.1983). The "restrictive" cases rely on the absence of express statutory grant of such power to Ch. 13 debtors, negative inferences from 11 U.S.C. § 522 and § 1303, and the danger of unfair use of such powers by debtors. The "permissive" cases rely on the absence of express statutory prohibition of use of such powers by debtors, legislative history warning against negative inferences from § 1303, the impracticality of confining such powers to Ch. 13 Trustees who, for economic reasons, are disinclined to use them, see 28 U.S.C. § 586(e), and the benefits of

proper use of such powers to redress preferential and fraudulent transfers, etc. Both camps have defensible positions. An attempt to find a middle ground was made in *In re Bruce*, 96 B.R. 717 (Bankr. W.D.Tex.1989).

■ This difficult issue need not be completely resolved in this case. At least, it is apparent from § 522(g), (h), (i) that debtors may only use these avoiding powers *for their own benefit as debtors* within the narrow limits prescribed by that statute. The question is whether or to what extent debtors may use these avoiding powers *when debtors are acting for Trustees*. These powers are normally used by Trustees on behalf of bankruptcy estates. *If* debtors are to use these powers in place of Trustees, debtors must use them as Trustees would use them, on behalf of bankruptcy estates. A Trustee is strictly bound to place the interest of his beneficiaries before his own self-interest, *In re Republic Financial Corporation*, 128 B.R. 793, 802 (Bankr.N.D.Okl.1991). A bankruptcy case is "a trust of an unusual type, whose obligations may be unusually difficult and even contradictory," *id.* at 802. But creditors are certainly included among the "beneficiaries" of a bankruptcy estate; and their interests cannot be disregarded by anyone acting for the estate. Therefore, *even if* debtors have some right to use these powers at all, the use of such powers in an inappropriate manner or for unworthy purposes cannot be permitted. A Trustee's duty in this regard may be stated in terms of "good faith," 76 AM. JUR.2D (1975) "Trusts" §§ 315 et seq.

With this in mind, the Court proceeds to consider whether debtor's plan is proposed "in good faith" as required by 11 U.S.C. § 1325(a)(3).

Good faith is an "elusive term," *In re Pine Hill Collieries Co.*, 46 F.Supp. 669 (E.D.Pa.1942). The term was repeatedly used in the former Bankruptcy Act of 1898 and its amendments and in former Bankruptcy Rules, but was "purposely left undefined, with the thought that the content of the phrase should be allowed to develop and to be construed in accordance with the

cases as they arise," 6 (Pt. 2) *Collier on Bankruptcy* (14th ed. 1978) ¶ 9.21 p. 1675 citing House Hearings on H.R. 6439, 75th Cong., 1st Sess. (1937) 181. The term appears but remains undefined in the present Bankruptcy Code, presumably for the same reason.

Good faith is often thought of as a subjective thing, "honesty in fact," e.g. Uniform Commercial Code § 1–201(19). This principle may be appropriate for some purposes, but it is not to be eagerly embraced, for it implies that people who have no conscience are always in good faith, Summers, " 'Good Faith' in General Contract Law and the Sales Provisions of the Uniform Commercial Code," 54 Va.L.Rev. 195 (1968).

All of the varied reorganization chapters of the former Bankruptcy Act, namely Chapters IX, X, XI, XII and XIII ("Ch. IX" ... "Ch. XIII"), required good faith as an element of confirmable plans, Act Secs. 83e(5), 203, 221(3), 361, 366(4), 467, 472(4), 656a(4), and see *Collier on Bankruptcy* (14th ed. 1977, 1978) Vol. 5 ¶ 81.10 n. 3, ¶ 81.19 n. 12, Vol. 6 (Pt. 2) ¶ 9.21, Vol. 6A ¶ 11.08, Vol. 9 ¶ 9.07[6], ¶ 9.20, Vol. 10 ¶ 29.-06[6]. There is a dearth of reported cases dealing with good faith in Ch. XIII plans and with *debtors'* good faith in proposing plans under other chapters of the former Act. But there was a significant body of case law on the subject of *creditors'* good faith in accepting or rejecting plans. These cases provide some indispensable background to the present issue.

The ground rules were stated by Mr. Justice Douglas in *American United Mutual Life Ins. Co. v. City of Avon Park, Florida,* 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940). In that case, a Ch. IX municipal reorganization plan was accepted by the requisite two-thirds of interest holders. But the city's fiscal agent, who solicited the votes in favor of the plan, had not told the bondholders everything he knew: the fiscal agent itself a major creditor of the city.

> The very minimum requirement for fair dealing was the elementary obligation of full disclosure of all of [the fiscal agent's] interests ...

We have emphasized that full disclosure is the minimum requirement in order not to imply that it is the limit of the power and duty of the bankruptcy court in these situations. As this Court stated in *Securities & Exch. Commission v. United States Realty & Improv. Co.,* 310 U.S. 434, 455, 84 L.Ed. 1293, 1303, 60 S.Ct. 1044 [1053], 42 Am Bankr Rep(NS) 602: "A bankruptcy court is a court of equity ... and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act. ... A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest." And see *Pepper v. Litton,* 308 U.S. 295, 304 et seq., 84 L.Ed. 281, 287, 60 S.Ct. 238 [244], 41 Am Bankr Rep(NS) 279. These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization, and the obtaining of assents thereto. As we said in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 114, 84 L.Ed. 110, 119, 60 S.Ct. 1 [6], 41 Am Bankr Rep(NS) 110, "The court is not merely a ministerial register of the vote of the several classes of security holders." The responsibility of the court entails scrutiny of the circumstances surrounding the acceptances, the special or ulterior motives which may have induced them, the time of acquiring the claims so voting, the amount paid therefor, and the like. ... Only after such investigation can the court exercise the "informed, independent judgment" ... which is an essential prerequisite for confirmation of a plan. ... Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few, or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need. [The court then gave examples which] indicate the range and type of power which a court of bank-

ruptcy may exercise in these proceedings. That power is ample for the exigencies of varying situations. It is not dependent on express statutory provisions. In inheres in the jurisdiction of a court of bankruptcy. The necessity for its exercise ... is based on the responsibility of the court before entering an order of confirmation to be satisfied that the plan in its practical incidence embodies a fair and equitable bargain openly arrived at and devoid of overreaching, however subtle ....

*Id.* 311 U.S. pp. 145–146, 61 S.Ct. pp. 161–162, 85 L.Ed. pp. 95–96.

In other cases, courts wrestled with the problem of creditors who, openly and without concealment, sought to use the mechanisms of the Bankruptcy Act to gain unconscionable advantages. Courts were understandably reluctant to brand mere self-interest as "bad faith." In *In re Pine Hill Collieries Co.*, supra, the District Court observed,

> The Securities and Exchange Commission suggest[s] in its brief that if assent is withheld to serve some ulterior selfish purpose good faith is wanting. If the emphasis be placed on "ulterior" rather than "selfish" this seems to be as practical a test as could be found. What is selfishness from the standpoint of those who derive no benefit from conduct under scrutiny often becomes enlightened self-interest if viewed from the standpoint of those who gain by it. If a selfish motive were sufficient to condemn reorganization policies of interested parties, few, if any, would pass muster. On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior.

*Id.* p. 671. But in *Young v. Higbee Co.*, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945), the Supreme Court by Mr. Justice Black ruled that "those ... whose selfish purpose was to obstruct a fair and feasible reorganization ... were acting in bad faith

within the statutory meaning of that term," *id.*, 324 U.S. pp. 211–212, 65 S.Ct. pp. 598, 89 L.Ed. pp. 896–897. As Mr. Justice Black observed, "historically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another," *id.* 324 U.S. p. 210, 65 S.Ct. p. 597, 89 L.Ed. p. 896. Stockholders who refused assent to a plan merely "in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt assets" used the bankruptcy plan-voting provisions to frustrate fundamental bankruptcy policy, hence "were acting in bad faith within the statutory meaning of that term." It was the attempt to use bankruptcy devices in a manner contrary to bankruptcy policy, whether or not concealment or fraud was involved, which amounted to bad faith. Applying these principles to Ch. XIII, a leading treatise on the Act correctly concluded that

> Fraud, improper scheduling, payment or promises to pay money to procure acceptances are instances of lack of good faith ... but generally the inquiry is directed to whether or not there has been an abuse of the provisions, purpose, or spirit of Chapter XIII in the proposal or plan,

10 *Collier on Bankruptcy* (14th ed. 1978) ¶ 29.06[6] p. 339.

And what was the policy, purpose or spirit of Ch. XIII? According to Walter Chandler, author and sponsor of the Chandler Act of 1938 and creator of Ch. XIII, the problem that Ch. XIII was intended to solve was that "millions of our citizens have only a narrow margin of solvency despite the careful exercise of good husbandry," so that "[a]ny unexpected or unavoidable expenses inevitably result in buying in advance of income" until "the harried debtor finds himself at the 'end of his row,'" Chandler, "The Wage Earners' Plan: Its Purpose," 15 Vand.L.Rev. 169, 171–172 (1961). What was needed was "remedies where both debtors and creditors may extricate themselves from irrevocable losses" while "at the same time, the economy of the nation and the character of

its citizens need not be seriously affected," *id.* p. 172. Accordingly, Ch. XIII was

Introduced as a bill for the relief of harassed wage earners who desire to pay their debts if given sufficient opportunity ... who, without being adjudicated bankrupt, wish to pay their debts in installments under the protection of a federal court, free from garnishments, executions, attachments, penalties, usury, or excessive costs ... It is not a moratorium for debtors, as some have thought. It is amortization ... [D]ebtor submits a plan for payment of his debts in installments from his wages or salary ... Having availed himself of this procedure, the debtor, as a matter of good faith and under the law, is expected to see the proceeding through to its conclusion, if possible ... The result will be beneficial to the debtors in that they will be aided in meeting their obligations according to plan, and will be of great benefit to creditors who will receive payments from debtors otherwise unable to pay,

*Id.* pp. 169–171. One of Ch. XIII's most experienced practitioners, Reginald McDuffee, Referee in Bankruptcy for the Southern District of Georgia, agreed that

In a wage earner proceeding, the debtor desires to pay. He is not seeking to avoid his debt but only to relieve himself from the harassment of garnishment or attachment proceedings or letters of debt-complaint to his employer or the like,

McDuffee, "The Wage Earner's Plan in Practice," 15 Vand.L.Rev. 173, 176 (1961). Judge McDuffee did not attempt to defend or excuse "[t]he whole sad, sorry mess of 'on-the-cuff' living and our so-called 'debt-explosion,'" *id.* p. 174. He noted the rising "volume of consumer bankruptcy" and proposed "softening the impact of this volume of cases upon our economy" by use of Ch. XIII "in proper cases," *id.* pp. 173, 188. He warned that "a continuing and accelerated increase in consumer bankruptcy," although "a fact of life," must be "held in check," *id.* pp. 173, 175. He promoted Ch. XIII as "creditor salvage," *id.* pp. 183, 187; noted that *"even when debts are cancelled, someone has to pay them," id.* p. 188

(emphasis original); and insisted that "A truly successful [Ch. XIII] operation requires," among other things, "Maximum deposits by debtor" and "A type of debtor who seeks out the court of bankruptcy not as a sanctuary, asylum or place of refuge, but as a means of learning (perhaps for the first time) the hard lesson of self-discipline," *id.* p. 193. Judge McDuffee wrote that "'the rehabilitation of the debtor'" continues to be the prime objective in all appropriate and proper cases," *id.;* but it is clear that such "rehabilitation" meant restoring debtor's financial standing, not simply cutting losses at creditors' expense.

Repayment of debts in full was both the ideal and the norm in practice: debtor relief consisted mainly of *extension* of the payment period. In some Districts, there was virtually no alternative to payment in full by extension. In other Districts, reduction of the amount paid, i.e. *composition* of debts, was a viable option, often in combination with extension. See H.Doc. No. 93–137, *Report of the Commission on the Bankruptcy Laws of the United States, July 1973* (93d Cong., 1st Sess.), Part I, pp. 160–162. Either way, the idea was to enable a debtor to keep his assets from liquidation and avoid the "psychological stigma [of] being ... bankrupt" while using his wages to provide his creditors with "a much better chance that [debts] will be paid off, if not in full at least fairly close to it," 10 *Collier on Bankruptcy* (14th ed. 1978) ¶ 20.01 p. 3.

Overemphasis on repayment in full perversely drove debtors who could pay only part of their debt to file "straight bankruptcy" and pay none of it. In 1973, the Bankruptcy Commission recommended that debt composition be resorted to in preference to "straight bankruptcy," but suggested that debtors who desired this extra remedy do some extra things to earn it.

If composition of debts is to be encouraged as an alternative to straight bankruptcy for debtors with regular income, the application of a debtors' nonexempt assets to reduce the amount of the indebtedness to be payable out of future income should be authorized, and indeed

the use of nonexempt assets may likewise be appropriate in a plan contemplating an extension without reduction of debts. Otherwise, a plan proposed by such a debtor may not be in the best interests of the creditors. The Commission accordingly recommends that the proposed Act authorize the payment of debts out of proceeds of the sale of his nonexempt assets as well as future income. The Act should not require such application of the nonexempt assets to the immediate repayment of debts, however, except insofar as such application may be deemed necessary by the administrator or by the court to meet the statutory standards of the "best interests of creditors" and "good faith." A requirement that all of the debtor's nonexempt property be applied immediately to the payment of his debts would subject the petitioner with regular income ... to the obligations and burdens imposed on a bankrupt under the liquidation chapter along with the obligation assumed to pay debts out of future income,

*Report,* supra, p. 164. The Commission warned that "such an independent determination [by the court] that statutory standards [of good faith, etc.] have been met is the best assurance of the protection of creditors' interests," *id.* p. 162. The Commission especially commended the work of Conrad Cyr, Referee in the District of Maine, in achieving successful and responsible compositions, *id.* Judge Cyr was no pro-creditor fanatic, for he made available to debtors the generous remedy of composition. He was no pro-debtor fanatic either, for he believed that bankruptcy relief should be made available only as deserved and appropriate, not simply on demand. In 1975, Judge Cyr told a House subcommittee,

> ... it should not be presumed that an open credit policy necessitates an open discharge policy ... I believe that, if a man is able, he should meet his commitments ... my effort has largely been to try to differentiate between the debtor who is deserving of relief and the debtor who is not, in the hopes that more re-

sponsive relief can be made available to deserving debtors.

He wanted a system "in which the quality of the relief available is related to the debtor's need." He actually practiced such a system, and insisted that "It is essential to an effective equity jurisprudence that controversies be addressed in light of their individual and societal contexts." See Hearings on H.R. 31 and 32 Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 1st & 2d Sess. (1975–1976) pp. 201–209.

Congress undertook to remedy the deficiencies of old Ch. XIII in the Bankruptcy Code of 1978. Legislative history of the Code provides an explicit statement of the purpose and spirit of new Ch. 13.

> Since World War II, the incidence of consumer credit has grown enormously ...

The result of the increase in consumer credit has been a corresponding increase in the number of consumers who have overburdened themselves with debt. Often, these consumers are able to keep up with their obligations in normal times, but have saved very little for emergencies or unexpected events. When a family member takes seriously ill or when the breadwinner is laid off from his job, a financial crisis ensues. In many cases, a young family of two, both working, incur a large amount of debt. If the wife stops working because of pregnancy, the family loses nearly half of its income, and has an extra member to feed and shelter. The family will go deeper and deeper into debt to ·support themselves, until finally the roof falls in.

The vast majority of consumer financial crises are of these kinds. Aggressive advertising and sales techniques by the consumer credit industry ... add to the problems young families encounter. When the crises finally erupt ... [h]arsh collection practices heaped on top of already serious financial problems often result in ill health, family strain and divorce, and loss of jobs for many overex-

tended consumer debtors. Bankruptcy often provides the only remedy ...

However, under current law, the resort to bankruptcy has not always provided an effective remedy ...

... [A]n overly stringent and formalized chapter XIII (wage earner plans) has discouraged overextended debtors from attempting to arrange a repayment plan under which all creditors are repaid most, if not all, of their claims over an extended period. The hearings before the Subcommittee indicated strongly that most consumer debtors would rather work out a repayment plan than file straight bankruptcy. They opt for straight bankruptcy only because present chapter XIII simply cannot meet their needs ...

... The premises of the bill with respect to a consumer bankruptcy are that use of the bankruptcy law should be a last resort; that if it is used, debtors should attempt repayment under chapter 13 ...; and, finally, whether the debtor uses chapter 7 ... or chapter 13 ..., bankruptcy relief should be effective, and should provide the debtor with a fresh start ...

The purpose of chapter 13 is to enable an individual, under court supervision and protection, the develop and perform under a plan for the repayment of his debts over an extended period. In some cases, the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement ... This protection relieves the debtor from indirect and direct pressures from creditors, and enables him to support himself and his dependents while repaying his creditors at the same time.

The benefit to the debtor of developing a plan of repayment under chapter 13, rather than opting for liquidation under chapter 7, is that it permits the debtor to protect his assets. In a liquidation case, the debtor must surrender his nonexempt assets for liquidation ... Under chapter 13, the debtor may retain his property by agreeing to repay his creditors. Chapter 13 also protects a debtor's credit standing far better than a straight bankruptcy

... The benefit to creditors is self-evident: their losses will be significantly less than if their debtors opt for straight bankruptcy.

H.Rep. No. 95–595, pp. 116–118 (1977) U.S.Code Cong. & Admin.News 1978 pp. 5787, 6076, 6078. Obviously, new Ch. 13 was intended to differ from old Ch. XIII only in detail. The purpose and spirit of both is the same. New Ch. 13's departures from former Ch. XIII were intended to make it more popular and effective, but were not intended to alter the basic objective of helping debtors *repay* debts rather than discharge them. The ideal was not forsaken, merely accommodated to reality. Accommodation to reality does not mean complete abandonment of principle.

How much repayment is enough, or in other words how much composition will be allowed, is a sorely-vexed question. There is little doubt from legislative history that Congress saw *full* repayment as the ideal, *partial* repayment as a regrettable necessity on some occasions. How much should debtor pay to get the broad Ch. 13 discharge? A debtor who proposed to pay *slightly* more than Ch. 7 would yield creditors, to get a Ch. 13 discharge which is *considerably* greater than in Ch. 7, see 11 U.S.C. § 1328(a) would arguably abuse Ch. 13 and not be in good faith. This consideration caused some courts to insist on "meaningful" repayment in Ch. 13. This is all right in theory—no one can seriously suggest that debtors be allowed to make "meaningless" repayment in Ch. 13. But in practice, the "meaningful" repayment rule tended to degenerate into a rigid but nonstatutory percentage payback requirement.

In *Flygare v. Boulden*, 709 F.2d 1344 (10th Circ.1983), the Court of Appeals of this Circuit reversed a bankruptcy court's ruling that a Ch. 13 plan was in bad faith merely because it did not meet the bankruptcy court's own percentage payback requirement. In so doing, the Court of Appeals rejected all "per se" methods of determining good (or bad) faith, and insisted that bankruptcy courts consider and weigh all the circumstances in each case, following *In re Estus*, 695 F.2d 311 (8th Circ.

1982). The Court of Appeals in *Flygare* did not say exactly what good faith means in Ch. 13, but did offer a non-exclusive list of relevant circumstances to be considered, as follows:

"(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee,"

*Flygare v. Boulden*, 709 F.2d pp. 1347–1348 quoting *In re Estus*, 695 F.2d p. 317. The Court of Appeals wanted no "summary treatment" of such matters, 709 F.2d p. 1348; "the weight given each factor will necessarily vary with the facts and circumstances of each case," *id.*

In *In re Rasmussen*, 888 F.2d 703 (10th Circ.1989), the Court of Appeals of this Circuit again did not say what good faith is, but gave an example of what it isn't. Debtor filed under Ch. 7, discharged most of his debts therein but failed to discharge a fraud debt excepted from Ch. 7 discharge by 11 U.S.C. § 523, and thereupon converted to Ch. 13. The bankruptcy court allowed debtor to proceed, because debtor's budget was " 'tight,' " 888 F.2d p. 704, which suggested that debtor was making his best effort; there was no express statutory bar on successive chapters; and the invocation of Ch. 13's broader discharge as a follow-up to a Ch. 7 discharge was " 'clever lawyering' " as distinguished from " 'deviousness,' " *id.* The District Court affirmed. The Court of Appeals reversed.

On balance, using the "totality of the circumstances" approach required by *Flygare*, we conclude that Mr. Rasmussen's Chapter 13 filing was not made in good faith ... because the Chapter 13 filing was a manipulation of the bankruptcy system in order to discharge a single debt for de minimis payments under a Chapter 13 plan which was ruled not dischargeable under an immediately previous Chapter 7 filing, when the debtor could not originally meet the jurisdictional requirements of Chapter 13.

888 F.2d p. 706. The Court of Appeals also cited and quoted *Neufeld v. Freeman*, 794 F.2d 149 (4th Circ.1986) to the effect that minimal payments may be acceptable if "the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims," 888 F.2d p. 705. Apparently the "totality of the circumstances" indicated to the Court of Appeals that Rasmussen was trying to shed his debts, not to "satisfy" them; and under such circumstances, something more than "clever lawyering" was needed to justify granting a Ch. 13 discharge. However, debtor apparently had minimal income with which to fund a plan; and the Court of Appeals did not make clear exactly why this particular "best effort" was not good enough.

In *In re Perkins*, 55 B.R. 422 (Bankr. N.D.Okla.1985), this Court held a Ch. 13 plan in good faith wherein debtors "attempt to benefit both their creditors and themselves in this case," *id.* p. 424.

 In sum, "good faith" in Ch. 13 means debtor's attempt to restore normal financial relations with creditors, to the extent reasonably feasible under the circumstances. Both debts and assets, creditors' interest and debtor's interest, must be

taken into account and fairly accommodated. What is "fair enough" may be a range of permissible alternatives rather than a single "right" way, and will vary according to circumstances; but there must be a reasonable balancing of interests and minimization of harm. It is the Court's duty to see to it that this minimum standard is met. In terms of the present case, debtor may protect nonexempt assets by using Ch. 13; but the degree of protection of assets must be fairly related to other factors, such as degree of fault in incurring debt and degree of repayment or composition of such debt. A debtor who wants more drastic composition of debts may be expected to perform more extensive liquidation of nonexempt assets.

A Ch. 13 case may be dismissed "in the best interests of creditors and the estate, for cause," 11 U.S.C. § 1307(c). Cause for *dismissal* exists if a Ch. 13 case is not *filed* in good faith, according to the inherent power and duty of courts to protect their jurisdiction from abuse. If a Ch. 13 case is not dismissed but reaches the plan-confirmation stage, *confirmation* of a proposed plan must be denied unless "the plan has been *proposed* in good faith," 11 U.S.C. § 1325(a)(3) (emphasis added). If lack of good faith is urged as a *cause for dismissal*, the question would ordinarily be whether the Ch. 13 case should ever have been filed at all—whether debtor needs or deserves relief of any sort under Ch. 13— whether the mere filing of the case is sufficient to abuse Ch. 13's provisions, such that the appropriate remedy is dismissal of the case without waiting for debtor's plan to come on for confirmation. But if lack of good faith is urged as *ground for denial of confirmation of a proposed plan*, the question would ordinarily be whether a debtor who admittedly needs or deserves relief of some sort under Ch. 13 has proposed a plan which would treat debtor and creditors in a manner consistent with Ch. 13's purposes and policies—whether the proposed plan will do, or whether another and better one should be proposed instead. However, if confirmation is denied, under certain circumstances the denial of confirmation itself may provide an independent

cause for dismissal of the case under 11 U.S.C. § 1307(c)(1), "unreasonable delay by the debtor that is prejudicial to creditors," or (5), "denial of confirmation of a plan . . . and denial of a request made for additional time for filing another plan or a modification of a plan." These three different questions—dismissal for filing the case in bad faith; denial of confirmation for proposal of a plan in bad faith; and dismissal for denial of confirmation plus denial of a request for time to propose another plan— certainly overlap but are not identical and should be distinguished from each other as appropriate.

In the present case, Credit Union does not move to dismiss the case as filed in bad faith, but objects to confirmation of the plan as proposed in bad faith. Nor does it appear at this time that the case was filed in bad faith. Despite minor deficiencies, debtor's statement and schedules are reasonably complete and accurate, evidencing no attempt to conceal relevant information or mislead creditors, Trustee or Court. Debtor came to this Court because she was under significant financial pressure threatening her with loss of her job. Such financial pressure is not due solely, or even mainly, to overspending pure and simple. It may still be largely debtor's own fault, in that she incurred a debt for attorney fees to General Motors for bringing a losing lawsuit against them, and borrowed heavily to finance the purchase of a third motor vehicle even as General Motors commenced execution on its judgment. Although debtor seems to have been engaged in process-dodging, it does not clearly appear that debtor knew of the garnishment, or knew that the adverse judgment was final and was a legal debt, on the day she borrowed to buy her new truck. For present purposes, the Court presumes that debtor needs and deserves relief of some sort. The question is whether the sort of relief proposed by debtor in this plan is within the bounds of propriety, given the demands and objectives of Ch. 13.

Debtor's plan would commit all of her disposable income to payments extending over three years, the maximum normal

period of a Ch. 13 plan, 11 U.S.C. § 1322(c), § 1325(b)(1)(B), (2). Debtor's living expenses are generally reasonable. Debtor has not previously resorted to Ch. 7, and her debts do not appear to be of the aggravated character that should except them from discharge under Ch. 7. Debtor entered Ch. 13 with more motor vehicles than she needed or could afford under the circumstances, but she proposes to surrender one of them in full satisfaction of the debt it secures. Obviously, debtor's plan is not irrational or frivolous. Whether this plan is in good faith or not depends upon how this plan compares with alternative plans which might have been proposed in its stead.

██ Debtor might have kept all three motor vehicles and attempted to pay for them. This course would have exhausted debtor's disposable income as well as the last vestige of debtor's credit with this Court. The Court considers this option unrealistic and unreasonably hard on debtor's unsecured creditors.

██ Debtor might have kept only her old $200 Chevrolet, returned the Yugo to FMCC in full satisfaction of this debt, and either returned the Ford to Credit Union likewise or avoided Credit Union's security interest in order to liquidate the Ford for the benefit of unsecured creditors generally. This would have left debtor no means of transportation save a nearly-worthless vehicle of doubtful reliability. The Court considers this option unrealistic and unreasonably hard on debtor.

██ Debtor might have kept the exempt Chevrolet and the Yugo, paid for the Yugo according to the contract terms, and returned the superfluous Ford to Credit Union in full satisfaction of Credit Union's debt, without attempting to use Trustee powers to avoid Credit Union's security interest. In such instance, debtor's plan payments, modified to include $135.99 per month paid to FMCC, would yield total payments of $12,069.60 to be applied to the sole unsecured claim of General Motors in the amount of $25,183. The result would be a return to unsecureds, or rather to the sole unsecured, of almost 48% of the unsecured debt.

Debtor might have kept the exempt Chevrolet and the Yugo, paid for the Yugo according to the contract terms, used Trustee powers to avoid Credit Union's security interest, liquidated the Ford and paid the proceeds to unsecured creditors generally. In such instance, debtor's plan would yield payments from regular income of $12,069.60 plus liquidation proceeds of $10,500; subtracting about $500 therefrom as estimated litigation and sale costs, there remains total plan funding of $22,000.00. This would be applied to unsecured claims of General Motors and Credit Union totalling $38,690. The result would be a return to unsecured creditors of almost 58% of the unsecured debt. General Motors would get 65% of this, i.e. $14,300; Credit Union would get the balance of $7,700.

What debtor actually proposed to do was to keep the exempt Chevrolet, surrender the Yugo in full satisfaction of FMCC's debt, use the avoiding powers to defeat Credit Union's security interest, and keep the Ford truck without putting its proceeds back into the plan. In such instance, debtor's plan would yield payments of $14,361.96, to be applied to unsecured claims of General Motors and Credit Union totalling $38,690. The result would be a return to unsecured creditors of just over 38% of the unsecured debt. General Motors would get 65% of this, i.e. $9,335.27; Credit Union would get the balance of $5,026.69.

In sum, out of five possible plans, two are *prima facie* unreasonable and need not be further considered; but of the remaining three, debtor proposed the one that gave her the best deal while paying her creditors the least. The third plan outlined above would have paid General Motors $12,069.60 or 48% of its claim, and would have given Credit Union a vehicle worth some $10,000. The fourth plan outlined above would have paid General Motors $14,300 or 57% of its claim, and would have paid Credit Union $7,700 or 57% of its claim. Both of these possible plans would have left debtor in possession of one usable motor vehicle and one unreliable "backup"

vehicle. The fifth plan, the one actually proposed by debtor, would pay both General Motors and Credit Union less than either the third or fourth plan above, while keeping for debtor not one moderately good vehicle and a backup but an almost-brand-new, *very* good vehicle plus a backup. If there is any reason why debtor should not keep the Yugo and return or sell the Ford—any reason, that is, except debtor's own selfishness—it does not appear from the record.

Outside bankruptcy, an ordinarily prudent debtor under comparable circumstances would keep the less expensive vehicle, the Yugo, and give up the more expensive and valuable one, the Ford. Entering bankruptcy does not excuse a debtor from ordinary prudence. Where bankruptcy enables a debtor to free an asset from a security interest by using a Trustee's avoiding power, debtor's responsibility is actually increased beyond mere ordinary prudence to the equivalent of a Trustee's responsibility under like circumstances. Debtor's plan must evidence the responsibility that goes with the power. Debtor's proposed plan herein would actually enlarge unsecured debt (by demoting Credit Union from secured to unsecured status) and enforce a composition thereof which repays only 38% of total unsecured debt over 3 years. This relatively low repayment is due to the fact that debtor's plan does not bother to maximize liquidation of nonexempt assets to help reduce the debt. These one-sided measures are proposed by debtor to relieve her of a financial burden which is largely, though not entirely, her own fault. The Court is not convinced that debtor set out to cheat Credit Union of its collateral and filed Ch. 13 for that purpose. Rather, debtor filed bankruptcy under genuine financial pressure coming largely from General Motors; but apparently debtor (or her attorney) discovered Credit Union's vulnerability in the course of the bankruptcy proceeding; and debtor (or her attorney) now attempts to turn this circumstance to debtor's sole advantage, regardless of her creditors. Such "clever lawyering" may be well enough in its place; but this is not its place. Such selfish opportunism is not to be tolerated in a fiduciary, or in anyone who wants to be allowed to act as a fiduciary.

Debtor's plan would have debtor disregard ordinary prudence and wield a Trustee's power without a Trustee's responsibility, to the end of profiteering and debt avoidance rather than debt repayment; is contrary to the policy, purpose and spirit of Ch. 13; and, within the meaning of 11 U.S.C. § 1325(a)(3), is not in good faith. Hence the plan cannot be confirmed.

For a comparable ruling, which denied confirmation of a 36–month plan which "does not reflect a sincere desire to repay creditors in accordance with the spirit and purpose of Chapter 13" but "reveals only a sincere desire to keep the Cadillac," see *In re Jones*, 119 B.R. 996, 1005 (Bankr. N.D.Ind.1990).

■ Credit Union also proposes that, under 11 U.S.C. § 1325(a)(4), "It is quite possible that ... Credit Union would receive less under Chapter 13 than under Chapter 7," Credit Union's brief p. 11. Credit Union calculates a probable return to it in Ch. 7 of $3,753.93, while Credit Union calculates its return under debtor's proposed plan at only $3,511.92. Credit Union's calculations are based on an optimistic valuation of the Ford truck, do not take into account Ch. 7 administrative expenses, and do not appear to take into account debtor's proposed amendment to her plan increasing her monthly payments from $350 per month to $429.19 per month. The Court determines that a more realistic return in Ch. 7 would be approximately $3,400; debtor has already paid more than this under her proposed plan; and debtor would pay Credit Union a total of approximately $5,000 under her proposed plan, far exceeding any probable distribution in Ch. 7. This ground of objection to the plan need not be further considered.

■ Credit Union wants the case dismissed forthwith under 11 U.S.C. § 1307(c)(5). But debtor has not even had an opportunity to make a request for additional time for filing another plan or for modification of the original plan; and, as

noted above, there is no showing that the case itself was filed in bad faith. Dismissal at this time would be premature.

That leaves neither party to this contested matter with a clear victory. Credit Union has blocked confirmation of debtor's plan, but has not freed itself from the threat of losing its collateral—the Court has merely ruled that Credit Union may lose its collateral to unsecured creditors rather than losing it to debtor. Since Credit Union would become one of those unsecured creditors, its loss would be partially recouped, and would be less than under debtor's original plan. In theory, debtor should revise her plan and get it confirmed. But the Yugo may already have been surrendered and, if so, presumably cannot be got back; the value of either Yugo or Ford has probably depreciated in the intervening period; debtor has made substantial payments under the proposed plan whose confirmation is now blocked, and those pre-confirmation payments have already been distributed to creditors. Under such circumstances, debtor's ability to amend her plan to comply with the Court's ruling herein is problematical. What should have happened must now be accommodated to present realities.

Accordingly, Credit Union's objection to confirmation of debtor's proposed Ch. 13 plan is sustained, and confirmation of said plan is denied; but Credit Union's motion to dismiss the case under 11 U.S.C. § 1307(c)(5) cannot be granted or denied at this time, and must be continued to be reset or otherwise disposed of on further order of the Court; and a status conference on this case will be set by separate order or notice.

AND IT IS SO ORDERED.