In re PINE HILL COLLIERIES CO. et al.

No. 20914.

District Court, E. D. Pennsylvania.

Sept. 11, 1942.

670

Wolf, Block, Schorr & Solis-Cohen, by Robert B. Wolf, all of Philadelphia, Pa., for trustee.

Barnes, Dechert, Price & Smith, by Robert Dechert, all of Philadelphia, Pa., for Weston, Dodson & Co.

KIRKPATRICK, District Judge.

Section 203 of Chapter X of the Bankruptcy Law, 11 U.S.C.A. § 603, provides: "If the acceptance or failure to accept a plan by the holder of any claim or stock is not in good faith, in the light of or irrespective of the time of acquisition thereof, the judge may, after hearing upon notice, direct that such claim or stock be disqualified for the purpose of determining the requisite majority for the acceptance of a plan."

The question presented by the Trustee's petition, the answer and the testimony taken at the hearing is whether securities acquired for the purpose of defeating the plan should be disqualified in determining the requisite majority for acceptance. The court must interpret and apply the term "good faith" in the statute.

This reorganization proceeding was instituted in May, 1939. The Debtor was a coal mining company. There were three classes of creditors' claims: (a) A first mortgage in the amount of $1,105,000 securing a rather widely distributed bond issue; (b) a second mortgage in the amount of $1,300,000, all the bonds under which, having been originally owned by Locust Mountain Coal Co., were then held by a court-appointed receiver; (c) various land owners, parties to leases, with the Debtor extending generally to 1945.

Weston, Dodson & Co. (which will be referred to as Dodson) is another coal mining company, operating in the same field as the Debtor. In May, 1942, it owned $112,000 of the Debtor's first mortgage bonds and, indirectly, through its stock ownership in Locust Mountain Coal Co., had about a 20 per cent interest in the second mortgage bonds. It also owned over 51 per cent of the preferred and common stock of the Debtor. The stock has no value and has never been a factor in the reorganization. Prior to these proceedings Dodson had been operating the Debtor under a management contract and also had a general sales agency contract. The Dodson interest represents an actual cash investment of about $250,000, and Dodson is the largest creditor.

In July, 1939, the Trustee proposed a plan of reorganization generally similar in structure to the present plan, but providing for a loan from Reconstruction Finance Corporation of at least $578,000 together with some $200,000 from other sources, as opposed to a total of $140,000 to be advanced by private interests under the present plan. The plan granted no participation to the stockholders, but proposed the continuance of Dodson as manager and sales agent and provided for an underwriting by Dodson of $125,000. This plan received the support of Dodson. However, because of inability to obtain the consent of certain landlord creditors, the plan failed of consummation.

Thereafter, in December 1941, the Trustee proposed the plan now before the Court. Under it, Philadelphia & Reading Coal & Iron Co., a third coal mining company in the same field, is to advance the money for the development of certain mining property to be leased by it to the Debtor. The proposed arrangement is believed by the Trustee to be advantageous to the Debtor from an operating standpoint be-

cause of certain physical features of the mines of the two companies, which need not be detailed here. In January, 1942, the Trustee awarded a new sales contract, conditioned upon the adoption of the plan, to Philadelphia & Reading Coal & Iron Co., as the lowest of four bidders, among them Dodson, and subsequently terminated the Dodson management.

After hearings before the Special Master and the Judge, the Trustee's second plan was approved as fair, equitable and feasible. The plan was then submitted to the security holders for acceptance or rejection and May 1, 1942, was fixed as the time within which proofs of claims and ballots were to be filed. By that date, more than 70 percent of the first mortgage bondholders and more than the requisite majority of landlord creditors had filed acceptance to the plan. Dodson voted its first mortgage bonds against the plan.

Without unnecessary discussion, it may be said that the Court can, and would if necessary, extend the time for voting the second mortgage bonds to a future date, so that, in dealing with the question now raised, it may be taken that the voting of that class of claims is still open.

On July 9, 1941, Dodson, without disclosing its identity, purchased the entire second mortgage issue from the Locust Mountain receiver for $15,500. These bonds had not assented to the reorganization but, prior to the purchase the receiver had indicated that he had decided to vote them in the affirmative. Although there was no general agreement upon the point, it appears that, before he purchased them, Mr. Dodson was under the impression that the proposed plan had lapsed, by reason of the fact that they had not been voted favorably on May 1, 1942. He testified that the purchase was made to influence any subsequent plan which could have been submitted. However, there is no dispute that Dodson now proposed to vote the bonds against the plan if and when the Court fixes a date for voting them.

Although it cannot be made the subject of a fact finding, it seems more than likely that if the present plan is not accepted there will be no alternative except to liquidate the Debtor company.

Is Dodson's announced determination not to accept the plan in good faith, in view of the circumstances under which it acquired the second mortgage bonds?

No decision has been brought to my attention, nor have I found any, dealing with "good faith" in Section 203 of Chapter X. The predecessor provisions of Sec. 77B, 11 U.S.C.A. § 207, were construed by the Court in Texas Hotel Securities Corporation v. Waco Development Co., 5 Cir., 87 F.2d 395, 400. However, in that case the Court pointed out that the provisions of 77B did not apply to dissenters and particularly that they did not require "that the non-acceptors are to be investigated at all."

■ The new provision was intended to empower the Court to disregard dissenters, as well as assenters, not voting in good faith. It prescribes a standard of conduct defined by the elusive term "good faith", which must be met under pain of disqualification. The test is plainly to be sought in the motives of the holder of the claims. The Securities and Exchange Commission suggests in its brief that if assent is withheld to serve some ulterior selfish purpose good faith is wanting. If the emphasis be placed on "ulterior" rather than "selfish" this seems to be as practical a test as could be found. What is selfishness from the standpoint of those who derive no benefit from conduct under scrutiny often becomes enlightened self-interest if viewed from the standpoint of those who gain by it. If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior.

Without attempting anything more than the suggestion already made as to what good faith means, it will be sufficient to say that a party, largely interested in the Debtor before his acquisition of controlling votes, who withholds consent to a plan primarily because he believes its consummation will be more injurious to his investment in the Debtor than liquidation, meets the standard of good faith. Further, that in the case of a party so positioned, there must be more evidence of an ulterior purpose than the mere fact that the controlling votes were acquired during the progress of the proceedings, without regard to their intrinsic value and for the purpose of defeating the plan.

The Trustee and the Securities & Exchange Commission suggest as evidence of bad faith in the present case the following considerations:

█ First, Dodson purchased the bonds after the plan had been approved as fair, equitable and feasible. The statute expressly makes this a point which may be considered, but it also expressly directs that it shall not be controlling. Thus, the voting of claims acquired after the proceedings have been begun is countenanced, and purchasing them for that purpose could hardly have been intended as a mark of bad faith. Voting power is an incident of such claims and, if the purchaser uses it, it would often be quite impossible to say how far the purpose to do so entered into his decision to buy them. I think that if it had been intended that buying a claim for the purpose of voting it was bad faith Congress would have merely provided simply and effectively that claims acquired after reorganization proceedings had been begun might not be voted.

Second, Dodson offered no testimony in opposition to the plan before the Referee and did not appear against it before the Court. It is fairly evident that Dodson did not expect that the requisite consents from the first mortgage bondholders would be obtained and that the favorable vote of that class was a surprise to it, as well as to some of the other interests. But even if the action of the first mortgage had been anticipated, as has been pointed out, the acquisition of claims for the purpose of voting them does not alone disqualify them, nor does it change the situation that the acquisition was by a dissenting minority. Such minority may choose to use the veto power, which the law thus allows it to obtain, rather than go to the expense of producing testimony or attempting to persuade the other interests and the Court that the plan is not a good one. Had Dodson, intending to defeat the plan, misled anyone as to its position or, by apparent acquiescence, prompted the parties to go ahead with it, that might be taken as evidence of bad faith. In the present case, however, it is a fact known to the Court through conferences which were held in chambers at an early date that Dodson at all times maintained the view that the proposed plan was not feasible and would in all probability result in an early sacrifice of the Pine Hill property to the Philadelphia & Reading Coal & Iron Co. This view was at one time held by the receiver of Locust Mountain as well as some others interested in the first mortgage bonds. Dodson did suggest some modifications to which it would have consented, although it may be that there was very little chance of these modifications being accepted. They involved a much larger degree of risk to the Philadelphia & Reading Coal & Iron Co. than it was willing to assume.

Third, the price paid for the bonds appears to be in excess of any intrinsic value which they could have had. It is also a fact that, in acquiring the bonds Dodson did not disclose that it was the purchaser and in fact, by a mild deception on the part of the secretary of the company, tried to give the receiver the impression it was not. These facts I think do not condemn the motive of the purchase or of the refusal to vote favorably. They speak for the urgency of Dodson's desire to defeat the reorganization and have to do with the strength of the motive, not its quality.

█ As pointed out, Dodson has had at all times a very substantial stake in this enterprise. If, with no previous interest, it had bought into the reorganization merely to defeat it, then it might be necessary to search further to see whether the defeat of plan might benefit its other business, but the protection of its already large investment in the Debtor was, I believe, the primary motive which governed its conduct. The method which it adopted was legal, and I find as a fact that its proposed refusal to vote the second mortgage bonds in favor of the plan is in good faith. I therefore decline to rule that the claim be disqualified for the purpose of determining the requisite majority for the purpose of the plan.