**In re DUNE DECK OWNERS CORP., Debtor.**

**Bankruptcy No. 93 B 46021 (SMB).**

United States Bankruptcy Court, S.D. New York.

Jan. 5, 1995.

Kasowitz Hoff Benson & Torres (David M. Friedman, Lorie R. Beers, of counsel), New York City, for debtor.

Milbank Tweed Hadley & McCloy (Barry G. Radick, Michael J. Edelman, of counsel), New York City, for KHD Acquisition Corp.

## MEMORANDUM DECISION OVERRULING OBJECTIONS TO THE DEBTOR'S DISCLOSURE STATEMENT

STUART M. BERNSTEIN, Bankruptcy Judge.

The ostensible matter before the Court—approval of the Debtor's disclosure statement—masks the real issue: should the Court designate a secured creditor's vote based on claims purchased during the Chapter 11 case for the avowed purpose of defeating confirmation? KHD Acquisition Corp. ("KHD") holds an approximate $3 million claim secured by a mortgage on the Debtor's property, and opposes the plan.[1] After the Debtor filed its present plan (the "Second Plan") and disclosure statement, including exhibits (the "Disclosure Statement") in August 1994, KHD purchased the vast majority of unsecured claims in order to block the Debtor's plan.

KHD's tactic, doubtless motivated by the wish to shortcut the confirmation process, has produced more rather than less litigation. Armed with its new claims, KHD objects to the Disclosure Statement, arguing, *inter alia,* that it controls the unsecured vote, intends to vote against confirmation, and the Court should not approve the Disclosure Statement because the plan is uncon-

---

1. The Court has already denied a KHD motion to dismiss the case on the ground that the plan is unconfirmable as a matter of law. The Court ruled that the issues that the motion raised required an evidentiary hearing. KHD has raised many of the same arguments in connection with its opposition to the Debtor's motion to approve the proposed disclosure statement, but the result is the same—they do not warrant a determination that the Court should decline to approve the disclosure statement because the plan is unconfirmable as a matter of law.

firmable as a matter of law.[2] The Debtor counters, without formal motion, that KHD's anticipated vote lacks good faith, and the Court should designate, or disqualify, the vote pursuant to 11 U.S.C. § 1126(e).

On such a motion, the facts drive the law. The Court must ultimately decide whether KHD's anticipated vote is motivated by a legitimate concern over the treatment of its claim or the prospects for reorganization, or some other, unrelated reason which the law condemns. While one who purchases claims to block a plan need not always explain the motive for its vote, the facts that have been brought to the Court's attention mandate a factual inquiry in this instance. Accordingly, the Court overrules the objections and approves the Disclosure Statement, and directs that the factual issues relating to the designation of KHD's vote be tried together with the other confirmation issues.

### FACTS

The Debtor, a co-operative corporation, filed its Chapter 11 petition on November 30, 1993. The Debtor is the lessee under a long term ground lease and owner of an apartment building, situated on the leasehold estate, consisting of 91 units and located in Westhampton, New York. It is largely a vacation resort, and the shareholders either use their units, or rent them to vacationers, during the summer months.

The sponsor of the Debtor's co-operative conversion, Dune Beach Associates (the "Sponsor"), initially offered the Debtor's shares pursuant to a December 1987 Offering Plan. It appears that the Sponsor also owned or had some interest in other substantially contiguous resort properties. These other resort properties included separately incorporated co-operatives—the Harborside, the Westhampton Bath & Tennis Club and the Cabins and Cabanas at the Westhampton Bath & Tennis Club—as well as a marina.

In May 1988, the Sponsor recorded a Declaration of Covenants, Restrictions, Easements, Charges and Liens (the "Declaration"). In substance, the Declaration grant-ed each unit owner in the various resort properties, including the Debtor's tenant shareholders, certain rights of way for ingress and egress as well as the use and enjoyment of the common areas. The Declaration established an "Association"—the Westhampton Beach Club, Inc.—to administer its purposes, but the Beach Club no longer operates. The Declaration can be amended by an instrument signed by at least 80% of the votes of the Association's membership.

In October 1988, the Sponsor entered into an agreement with Marine Midland Bank, N.A. ("Marine"). Among other things, the Sponsor transferred to Marine its Note evidencing the Debtor's principal obligation of $2,594,000.00, together with the leasehold mortgage on the Debtor's property which secured the Note. The Sponsor also delivered mortgages on its underlying fee interests in the Debtor's leasehold, as well as the Westhampton Bath & Tennis Club. The Debtor's Note was due on March 31, 1993, and following the Debtor's default, Marine commenced a foreclosure action. By agreement dated November 1, 1993, Dune Deck Acquisition Corp. ("DDAC") agreed to purchase from Marine those interests that Marine had received from the Sponsor, but this contract remained unconsummated on the petition date.

Thus, at the time of the filing, the Debtor's property, and its rents, issues, and profits, secured an approximate $3 million loan, inclusive of interest, held by Marine. The Debtor's petition valued its property at $1.6 million, leaving Marine with a substantial, undersecured claim. The balance of the Debtor's unsecured debt was less than $100,000.00.

On December 16, 1993, seventeen days after the filing of the petition, DDAC and KHD entered into an Assignment (the "Assignment") pursuant to which DDAC transferred to KHD its rights under the November 1 contract with Marine in exchange for the payment of $1.8 million, the same amount DDAC was obligated to pay Marine. The Assignment contained other provisions relat-

---

**2.** KHD also asserted relatively minor objections to the content of the Disclosure Statement which the Court overrules for the reasons stated at the end of this opinion.

ing to the Declaration that are discussed in detail below. No direct or indirect affiliation existed between DDAC and KHD. (Affidavit Of Kary H. Deavers, sworn to Sept. 1, 1994, ¶ 2.)

Once KHD stepped into the picture, it zealously monitored the use of its cash collateral. During the first several months of the case, and despite a good deal of rancor and litigiousness, the Debtor and KHD entered into a cash collateral stipulation, which the Court approved, regarding the maintenance and operation of the property. Under the terms of the stipulation, KHD consented to the use of its cash collateral to operate the property, but subject to the limits imposed by the stipulation. Among other things, the Debtor was required to establish a fund for use during the off-season to maintain the property.

As the important 1994 summer season approached, serious disputes and problems arose between the parties. KHD alleged that the Debtor had failed to comply with the parties' cash collateral stipulation by, *inter alia*, failing to escrow the funds necessary to cover the off-season expenses. KHD also complained about the Debtor's maintenance and operation of the property. As a result, KHD commenced an adversary proceeding to prevent the Debtor from further using cash collateral, and at the same time, the Debtor moved for the right to continue to use cash collateral.

KHD also sought relief from the automatic stay to continue the foreclosure proceedings commenced by Marine. KHD primarily contended that the Debtor lacked equity in the property, and the property was not necessary for reorganization because the Debtor had not filed a plan. Apparently in response to the motion, the Debtor filed a plan (the "First Plan") in which it valued its property at between $1.5 million and $1.8 million. The First Plan proposed to separately classify KHD's deficiency claim, aggregating between $1.2 million and $1.5, from the claims of the other unsecured creditors.[3]

On July 1, 1994, the Court rendered a decision on the motions in open court which seemed to sound the Debtor's death knell. It granted KHD's motion for a preliminary injunction to enjoin the use of cash collateral, and denied the Debtor's motion to use cash collateral. In addition, the Court granted relief from the automatic stay under 11 U.S.C. § 362(d)(2). The Debtor acknowledged that it lacked equity in the property, and moreover, had proposed a patently unconfirmable plan that depended upon the separate classification of KHD's undersecured claim, without any business justification, in violation of the Second Circuit's decision in *Boston Post Road Limited Partnership v. FDIC (In re Boston Post Road Limited Partnership)*, 21 F.3d 477, 483 (2d Cir. 1994).

The Court's July 1, 1994 decision apparently woke up the Debtor. The Debtor's management changed, and new shareholder management undertook efforts to manage the property. As a result of these changes and subsequent proceedings, the Debtor and KHD entered into various agreements to permit the limited use of cash collateral to run the property during the summer season, to require the Debtor to escrow certain funds for the maintenance of the property during the off-season, and to require the Debtor to file a new plan by August 19, 1994.

On or about the latter date, the Debtor filed the Second Plan and the related Disclosure Statement that it now asks the Court to approve. The Second Plan seeks to cure the legal defects in the First Plan, and circumvent KHD's apparent veto power over any plan. It doubles the estimated value of the Debtor's property, raising it to $3 million, based upon the property's perceived, potential income stream. This valuation renders KHD fully secured. The Debtor proposes to cram down KHD's secured claim by paying interest only at 8% per annum for eight years, at which time the full amount will become due. If, at that time, the Debtor

---

**3.** The Debtor also sought injunctive relief against Mr. Kary Deavers, the president of KHD, who, the Debtor claimed, had interfered with the Debtor's operation and harassed its shareholders. The Court denied the motion because of numerous procedural defects, and the Debtor did not pursue the matter at that time. Subsequently, however, the Debtor commenced a damage action against KHD and Deavers in this Court, basing its claims upon the same conduct.

pays 25% of the principal amount of the claim, the Debtor can extend the loan for another five years.

KHD thereupon supplemented its pending motion to dismiss the case, arguing that the Second Plan was facially invalid and could not be confirmed as a matter of law. It challenged the Debtor's 8% interest rate, the stretching out of the loan over eight and possibly thirteen years, and the 100% loan to value ratio, arguing that these components rendered the Second Plan unfair, inequitable and unfeasible. Although the Court expressed its reservations about the Debtor's ability to confirm the Second Plan, the Court declined to dismiss the Second Plan as a matter of law, ruling that the various issues that KHD had raised should be determined at a confirmation hearing.

Apparently seeking to circumvent the time and expense of a confirmation hearing, KHD took a new tack. After the October 19, 1994 bar date had passed, KHD ascertained that seventeen non-insider, non-duplicate claims had been scheduled or filed, and KHD proceeded to purchase fifteen such claims. According to the notices of transfer, which are on file with the Court, KHD paid 100% of the face value, or approximately $19,000.00, for nine such claims. KHD also purchased five large, unliquidated claims for an unknown amount, and one $9,550.00 claim held by Jacobs & Schwartz for something less than face value.[4]

KHD did not purchase the largest fixed, unsecured claim in the sum of $29,359.45 held

4. The record does not reveal how much KHD paid for the claim; it only reveals that it did not pay 100% of its face amount.

5. KHD also did not purchase an unsecured IRS claim in the sum of $380.22.

6. This excludes KHD's potential undersecured claim which the Debtor says is zero, and KHD estimates at approximately $1.5 million based upon the Debtor's own initial evaluation of its property. If KHD is correct, the designation of its purchased claims is immaterial because its undersecured claim is easily sufficient to veto confirmation of the plan.

7. Preemptory designation motions have been allowed by some courts, *see, e.g., In re Kovalchick*, 175 B.R. 863, 874 (Bankr.E.D.Pa.1994); *In re*

by Jaspan Ginsberg.[5] The Jaspan Ginsberg claim represents approximately 50%, in amount, of the fixed, unsecured claims. The Jaspan & Ginsberg and Jacobs & Schwartz claims, together, represent the overwhelming majority, in dollar amount, of the fixed, unsecured claims.[6]

## DISCUSSION

### A. Introduction

■ The Debtor concedes that if KHD can vote its purchased claims against the Second Plan, as it says it will, the Second Plan cannot be confirmed. (*Debtor's Supplemental Memorandum in Support of Approval of Its Disclosure Statement and In Opposition to KHDAC's Motion to Dismiss Debtor's Case*, at 1–2, dated Nov. 28, 1994.) Instead, the Debtor seeks to designate these claims pursuant to 11 U.S.C. § 1126(e).[7] This subsection provides:

On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

Section 1126(e) is derived from Section 203 of the Bankruptcy Act of 1898,[8] as amended, and former Bankruptcy Rule 10–305. Both authorized a court to disqualify a vote for acceptance or rejection of a Chapter X plan if the vote was not made in good faith, in light of or regardless of the time that the claim was acquired.

*Pleasant Hill Partners, L.P.*, 163 B.R. 388, 389 (Bankr.N.D.Ga.1994), but precluded by others. *In re A.D.W., Inc.*, 90 B.R. 645, 647 (Bankr. D.N.J.1988). In light of the Court's decision to try the matter at confirmation—after balloting is complete—the disagreement is academic.

8. Section 203 of the Bankruptcy Act provided:

"If the acceptance or failure to accept a plan by the holder of any claim or stock is not in good faith, in light of or irrespective of the time of the acquisition thereof, the judge may, after hearing upon notice, direct that such claim or stock be disqualified for the purpose of determining the requisite majority for the acceptance of a plan."

Rule 10–305 was substantially similar.

The term "good faith" was not defined in the Act or the Code, and instead, has been left to case law. 5 L. King, *Collier on Bankruptcy* ¶ 1126.05 at 1126–19 (15 ed. 1994) (*"Collier"*). Section 1126(e), which incorporates the pre-Code case law concerning disqualification of claims, 5 *Collier* ¶ 1126.05 at 1126–19, recognizes two types of bad faith: (1) the claim holder attempts to extract or extort a personal advantage not available to other creditors in its class,[9] and (2) the creditor has an "ulterior motive", such as to procure some collateral or competitive advantage that does not relate to its claim. *In re Marin Town Center*, 142 B.R. 374, 379 (N.D.Cal.1992); *In re Pleasant Hill Partners, L.P.*, 163 B.R. 388, 393 (Bankr.N.D.Ga. 1994); *see In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir.1988); *In re Lloyd McKee Motors, Inc.*, 157 B.R. 487, 488–89 (Bankr.D.N.M.1993).

The most common type of bad faith case, and the one at issue here, is the "ulterior motive" case. In one of the earliest and most frequently quoted decisions, *In re Pine Hill Colleries Co.*, 46 F.Supp. 669 (E.D.Pa. 1942), the court identified conduct that would require disqualification of the creditor's vote. Distinguishing between a selfish motive—which is not bad faith—and an ulterior motive—which is—the Court observed:

> The new provision [Section 203] was intended to empower the Court to disregard dissenters, as well as assenters, not voting in good faith. It prescribes a standard of conduct defined by the elusive term "good faith", which must be met under pain of disqualification. The test is plainly to be sought in the motives of the holder of the claims. . . . If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would

pass muster. On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior.

*Id.* at 671; *accord In re Federal Support Co.*, 859 F.2d at 19; *In re Lloyd McKee Motors Inc.*, 157 B.R. at 489; *In re MacLeod Co.*, 63 B.R. 654, 655 (Bankr.S.D.Ohio 1986).

Designation is the exception rather than the rule, and a creditor is free to vote its self-interest with respect to its claim. *In re 500 Fifth Avenue Associates*, 148 B.R. 1010, 1020 (Bankr.S.D.N.Y.1993). On the other hand, where the "purchase is in aid of an interest other than an interest of a creditor, such purchases may amount to 'bad faith'". *In re P–R Holding Corp.*, 147 F.2d 895, 897 (2d Cir.1945).

Over the years, Courts have developed several badges of bad faith which may justify disqualification. They include creditor votes designed to (1) assume control of the debtor, *In re Landing Associates Ltd.*, 157 B.R. 791, 807–08 (Bankr.W.D.Tex.1993); *In re Allegheny Int'l., Inc.*, 118 B.R. 282, 290 (Bankr.W.D.Pa.1990), (2) put the debtor out of business or otherwise gain a competitive advantage, *In re Landing Associates Ltd.*, 157 B.R. at 808; *In re MacLeod Co.*, 63 B.R. at 655–56; *see In re Pine Hill Colleries*, 46 F.Supp. at 672 (dictum); *but cf. In re Lloyd McKee Motors, Inc.*, 157 B.R. at 489 (the court refused to disqualify creditors' votes against the plan, even though the creditors were defendants in a lawsuit whose success would provide the sole basis for funding the plan, and the creditors voted against the plan to frustrate the litigation),[10] (3) destroy the debtor out of pure malice, *In re Landing*

**9.** Section 203 was intended to prevent creditors from opposing a plan, as an obstructive or hold-up tactic, until they were "bought off." *Young v. Higbee Co.*, 324 U.S. 204, 211 n. 10, 65 S.Ct. 594, 599 n. 10, 89 L.Ed. 890 (1945); *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir.1988).

**10.** The *Lloyd McKee* court relied upon several cases which do not support the blanket proposition that the creditor defendant can always vote against such a plan without any danger of disqualification. Rather, these cases stand for the proposition that the court will not infer an ulteri-

or motive or disqualify the vote of a creditor-defendant if the effect of plan rejection on the litigation is speculative, or it is not reasonable to infer that rejection of the plan and conversion of the case will have any effect on the prosecution of the litigation. *See In re Federal Support Co.*, 859 F.2d at 17 (effect on litigation speculative, the trustee would have the same incentive as the debtor to prosecute it, and "[w]ithout any other evidence, the pendency of the lawsuit itself is not enough to support an inference of a lack of good faith."); *In re Mikulec Industries, Inc.*, 1992 WL

*Associates Ltd.,* 157 B.R. at 808; *cf. In re Marin Town Center,* 142 B.R. at 379 ("Section 1126(e) does not require a creditor to have an interest in seeing the debtor reorganize"); *In re Kovalchick,* 175 B.R. at 875 (bad faith does not necessarily exist because the creditor has no desire to see the debtor reorganize or refuses to cooperate in the debtor's efforts to reorganize); *In re Pleasant Hill Partners, L.P.,* 163 B.R. at 395 (subjective ill will between the debtor and its secured creditor is insufficient to establish bad faith under Section 1126(e)),[11] or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize. *See In re Landing Associates,* 157 B.R. at 809.[12] In addition, the Code's legislative history makes clear that the Court can designate the vote of a creditor who has a conflict of interest with the class in which it votes.[13]

■ In a case like the present one, the Court must decide whether the creditor op-

170685 at *2–3 (W.D.N.Y. July 13, 1992) (creditor-defendant's vote did not "kill" litigation, and further, the litigation was already dead); *In re A.D.W., Inc.,* 90 B.R. 645, 651 (Bankr.D.N.J. 1988) (creditor-defendant got no benefit from rejection of the plan); *In re Landau Boat Co.,* 8 B.R. 432, 436 (Bankr.W.D.Mo.1981) (suit lacked merit, and in any event, "there is no evidence to suggest that the trustee would be less vigorous in pursuing it than would debtor's counsel").

**11.** As noted *supra* in footnote 3, the Debtor has filed an adversary proceeding that charges KHD and Deavers with interfering with the Debtor and its shareholders. Arguably, the Debtor's lawsuit alleges malicious conduct. The allegations, however, remain wholly speculative, and unsupported by affidavit or other testimony based on personal knowledge. These allegations are insufficient, therefore, to justify designation of KHD's vote.

**12.** The *Landing Associates* Court declined to disqualify the vote of a secured creditor who, through denial of confirmation, obtained benefits under an Assistance Agreement with the RTC. The Court, though repelled by the creditor's conduct and motives, expressed concern that by designating the vote, it would undermine the federal policy under which the RTC induces lenders to administer the assets of failed banks. 157 B.R. at 809. *See In re Marin Town Center,* 142 B.R. at 382 n. 5. The case before the Court does not implicate any such federal policy concerns.

poses the plan because of how it affects its claim, or instead, because the creditor really seeks to obtain some collateral advantage in another capacity. *See In re Landing Associates,* 157 B.R. at 803. This does not mean that the creditor who purchases claims to block a plan must, in every instance, explain the reason for its vote before it will be counted. Nevertheless, where the record contains evidence that the creditor has voted without regard to the treatment of its claim, but instead, to achieve some benefit or goal inconsistent with interests of the estate and its creditors, the Court must inquire into those motives in order to preserve the integrity of the Chapter 11 process.

## B. The Evidence of KHD's Motives

This is a case that requires inquiry into the creditor's voting motives. The record suggests that KHD's acquisition of a blocking position and anticipated vote against the Second Plan may be motivated by ulterior mo-

**13.** The original House Bill, H.R. 8200, 95th Cong., 1st Sess. (1977), included a provision, denominated § 1126(e), that expressly authorized the Court to designate the vote of an "entity that has, with respect to such class, a conflict of interest that is of such a nature as would justify exclusion of such entity's claim or interest" from the amounts and number of claims or interests required for acceptance. The present § 1126(e) was codified as § 1126(f). The House drafters intended to insure that a creditor who held conflicting claims in two classes could be excluded from voting in one—though not necessarily both—of those classes. H.R.Rep. No. 595, 95th Cong., 1st Sess. 411 (1977). The provision was intended to overrule cases such as *Aladdin Hotel Corp. v. Bloom,* 200 F.2d 627 (8th Cir.1953). *Id.* In *Aladdin,* a non-bankruptcy case, the shareholders of a company that was an obligor under an indenture were permitted to vote their personal bond holdings to extend the maturity date of the company's obligation under the indenture and thereby squeeze out the minority bondholders.

The conflict of interest section, which was not included in the Senate bill, S.2266, 95th Cong., 2d Sess. (1978), did not make it into the Code, as enacted. Congress deemed the provision unnecessary because in its view, Section 105 "constitutes a sufficient power in the court to designate exclusion of a creditor's claim on the basis of a conflict of interest." 124 Cong.Rec. S17420 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini).

tives within the purview of 11 U.S.C. § 1126(e). The Assignment between DDAC and KHD indicates that KHD may be acting for itself, DDAC, or both, in attempting to achieve a private agenda aimed at terminating the rights of the Debtor and its shareholders under the Declaration. Under paragraph 3(c) of the Assignment, KHD agreed not to renegotiate, restructure, reinstate or extend the Debtor's debt unless 51% of the Debtor's tenant-shareholders (other than the Sponsor), executed a memorandum (the "Termination") agreeing to terminate the Debtor's rights under the Declaration. No one has explained why it is important to DDAC to end the Declaration.

Yet under the Assignment, the Termination provides actual and potential benefits to KHD and DDAC, and harms the Debtor and the estate. First, the benefits of termination give KHD a financial incentive to oppose any plan and foreclose its mortgage. If KHD forecloses, and purchases the Debtor's property at the foreclosure sale, the Assignment obligates it to terminate the Declaration by executing and delivering the Termination to DDAC. In exchange for the Termination, DDAC must pay KHD $100,000.00. If, on the other hand, an independent third party outbids KHD at the foreclosure sale, i.e., the third party bids enough to fully satisfy KHD's $3 million secured claim, KHD must either deliver a Termination executed by the purchaser or pay $100,000.00 to DDAC. If KHD has to pay $100,000.00 out of the $3 million it receives by virtue of being outbid at the foreclosure sale, it would still net $2.9 million on a transaction in which it paid $1.8 million to acquire the mortgage. Accordingly, KHD has nothing to lose and much to gain under the Assignment by opposing the plan and foreclosing its mortgage on the Debtor's property.

Second, the delivery of the Termination provides a direct potential financial benefit to DDAC. The Debtor, together with the other resort properties comprising the Association, have asserted claims to portions of the $50,-000.00 paid annually by the marina owner, pursuant to the Declaration. (Assignment ¶ 3(c).)[14] Under the Termination, however, the Debtor (or any person authorized to execute the Termination following foreclosure) will assign this claim—for no apparent consideration—to DDAC.

Third, the termination of the Declaration may harm the Debtor or help KHD in other, less obvious ways. The Declaration grants the Debtor's shareholders access to and use of the other resort facilities, including the Westhampton Bath & Tennis Club, and according to the Debtor's Disclosure Statement, at page 5, the Offering Plan advertised these Declaration-based rights as an inducement to purchase shares in the Debtor. The termination of the Declaration may, therefore, decrease the demand for the Debtor's shares, and the incentive for existing and future shareholders to invest in the physical property. This, in turn, may affect the value of the Debtor, because the Debtor depends on shareholder maintenance as its primary source of income, and special shareholder assessments (as well as income) to fund capital expenditures.

Further, the Court cannot gauge the motivating force of this private agenda without understanding whether DDAC or KHD hold other interests that benefit from the termination of the Declaration. KHD and DDAC own a variety of interests in, or relating to, the resort properties that may be affected by the termination. For instance, DDAC owns the fee interests leased to the Debtor and the Westhampton Bath & Tennis Club. In addition, KHD holds the mortgage of those fee interests, as well as the mortgage on the Debtor's leasehold. The termination of the Declaration may enhance the value of the fees and related mortgages, and may, therefore, be motivating KHD's opposition.

Accordingly, there is ample evidence in the record—beyond mere speculation—to require an evidentiary hearing to determine whether to designate the votes that KHD purchased in November, 1994. In the final

---

**14.** Exhibit C to the Disclosure Statement contains a projected, five year budget in which the Debtor forecasts annual revenues of $17,000.00 from the marina owner. Lacking further enlightenment, the Court assumes that this figure represents the Debtor's estimate of its share of the marina owner's annual payment.

analysis, the Court must decide whether KHD's opposition to the Second Plan stems from its business judgment that its secured claim faces better prospects through foreclosure than under the Debtor's plan, or on the other hand, derives from a desire to reap the obvious and potential benefits for itself or DDAC that come with foreclosing the mortgage and terminating the Declaration. Consequently, the fact that KHD has purchased a blocking position does not necessarily grant it veto power over the Second Plan, or render the Second Plan unconfirmable as a matter of law.

### C. KHD's Other Objections to the Disclosure Statement

The Court overrules KHD's remaining objections to the Debtor's Disclosure Statement. The Court has previously rejected KHD's contention, made in connection with a discovery dispute, that the Debtor must disclose the financial abilities of the shareholders to pay maintenance and assessments over the life of the Second Plan—possibly thirteen years. Such disclosure intrudes on each shareholder's financial privacy—the shareholders are not Debtors—and the information, even if disclosed, would shed little light on the ability to pay future maintenance or assessments which depends primarily on continued employment and cash flow. This is a feasibility rather than a disclosure issue. Similarly, KHD's questioning of the assumptions influencing the Debtor's projections can best be tested at a hearing on the feasibility of the Second Plan.

### CONCLUSION

Having overruled KHD's objections, the Court has reviewed the Disclosure Statement, and finds it contains "adequate information" within the meaning of 11 U.S.C. § 1125(a). Accordingly, the Court approves the Disclosure Statement. The parties are directed to settle an order consistent with this decision which provides a blank space for the Court to insert the date for the confirmation hearing.