**In re DBSD NORTH AMERICA, INC., et al., Debtors.**

**No. 09–13061 (REG).**

United States Bankruptcy Court, S.D. New York.

Dec. 21, 2009.

Kirkland & Ellis LLP, by James H.M. Sprayregen, P.C., Esq., Christopher J. Marcus, Esq., Yosef J. Riemer, Esq., Lee Ann Stevenson, Esq., Matthew F. Dexter, Esq., Christopher V. Coulston, Esq., New York, NY, and by Marc J. Carmel, Esq., (argued), Sienna R. Singer, Esq., Lauren M. Hawkins, Esq., Chicago, IL, Attorneys for the Debtors and Debtors in Possession.

Curtis, Mallet–Prevost, Colt & Mosle LLP by Steven J. Reisman, Esq., Maryann Gallagher, Esq., Timothy A. Barnes, Esq., New York, NY, for Official Committee of Unsecured Creditors.

Milbank, Tweed, Hadley & McCloy LLP, by Dennis F. Dunne, Esq., Risa M. Rosenberg, Esq., Michael E. Comerford, Esq., Jeremy S. Sussman, Esq., New York, NY, and by Andrew M. Leblanc, Esq. (argued), Washington, D.C., for Ad Hoc Committee of Senior Noteholders.

Linklaters LLP by Martin N. Flics, Esq. (argued), Paul S. Hessler, Esq., New York, NY, for DISH Network Corporation.

K & L Gates LLP, by John H. Culver III, Esq., Felton E. Parrish, Esq., Charlotte, NC, for Sprint Nextel Corporation.

## DECISION ON DEBTORS' MOTION TO DESIGNATE DISH NETWORK'S VOTE TO REJECT DEBTORS' RE-ORGANIZATION PLAN[1]

ROBERT E. GERBER, Bankruptcy Judge.

### Introduction

In this contested matter in the chapter 11 cases of DBSD North America, Inc. and its subsidiaries (the "**Debtors**"), the Debtors move, pursuant to section 1126(e) of the Bankruptcy Code, to designate the votes of DISH Network Corporation ("**DISH**"), now the sole holder of debt in the First Lien Debt (as defined below) class, rejecting the reorganization plan before the Court for confirmation. As described more fully below, DISH became involved in these cases when, after the Debtors proposed a plan of reorganization, DISH bought up all of the Debtors' First Lien Debt from its prior holders, *at par*, seeking by its acquisition of the Debtors' debt, "to acquire control of this strategic asset." Thereafter, literally on the eve of the plan confirmation hearing, DISH sought to terminate exclusivity and obtain permission to file its own plan, further to achieve its strategic objective.

The motion is granted.[2] This is the paradigmatic case for the application of the *Allegheny doctrine*,[3] described more fully below. The Court's Findings of Fact and Conclusions of Law in connection with its determination follow.

### Findings of Fact

The Debtors are a development-stage enterprise formed in 2004 to develop an integrated mobile satellite and terrestrial services network (the "**Satellite System**") to deliver wireless satellite communications services to mass-market consumers. To date, the Debtors have made significant progress in developing the Satellite System, including launching a satellite and

---

**1.** This written decision memorializes and amplifies upon the decision delivered in open court on September 22, 2009.

**2.** This decision relates only to designation itself. The Court's ruling on the *consequences* of this designation, when DISH bought up all of the claims in its class and voted against the Plan, making assent by its class impossible, appears in its separate decision on confirmation, 419 B.R.179 (Bankr.S.D.N.Y. 2009).

**3.** *See In re Allegheny Int'l Inc.*, 118 B.R. 282 (Bankr.W.D.Pa.1990) (Cosetti, J.) ("*Allegheny*"), and the discussion at pages 138 through 140 below.

obtaining frequency bands and related regulatory approval from the FCC for the Satellite System.

But the Debtors are still a development-stage enterprise and, as such, do not yet have significant operations from which to generate revenues or cash flow. However, the Satellite System, as developed to date, has substantial value.

In 1992, EchoStar Satellite LLC ("**EchoStar**"), a satellite television equipment distributor, acquired a Direct Broadcast Satellite license from the FCC. In early 1996, EchoStar established DISH as a provider of satellite television. Since then, EchoStar and DISH have launched a number of satellites to accommodate the enterprises' growth, and they now own and lease a total of 14 satellites. In addition to developing its proprietary satellite system, DISH has made significant investments in TerreStar Corporation ("**TerreStar**"), a development-stage telecommunications enterprise like the Debtors', which is likewise engaged in designing and developing a mobile satellite and terrestrial services network to deliver wireless satellite communications services.

DISH's total investment in TerreStar, at various levels of TerreStar's capital structure, all of which is public in the filings related to DISH's investment,[4] is in excess of $250 million. DISH has 30 million shares of common equity in TerreStar, has an investment in a committed $50 million in vendor financing (approximately $15 to $20 million of which has been drawn down), and holds approximately $250 million (of TerreStar's $500 million) of first lien debt. TerreStar is a direct competitor of the Debtors.

On May 15, 2009, the Debtors filed for chapter 11 relief, and, on June 26, 2009, filed an amended plan (as amended to that point and thereafter, the "**Plan**") and associated disclosure statement. Under the Plan, the Debtors proposed to satisfy their first lien secured prepetition debt of approximately $40 million (the "**First Lien Debt**") through issuance of a modified promissory note, under an amended first lien facility (the "**Amended Facility**").

On July 9, 2009, about two weeks after the Debtors filed the Plan and disclosure statement (each of which disclosed the proposed treatment for the First Lien Debt), DISH purchased all of the First Lien Debt, in a principal amount of approximately $40 million, at par. Additionally, also after the Debtors' chapter 11 filing, DISH through an affiliate purchased approximately $111 million in principal amount of the Debtors' "7.5% Convertible Senior Subordinated Notes," representing second lien debt (the "**Second Lien Debt**")—a fulcrum security that the Plan proposed to convert to equity. DISH purchased Second Lien Debt only from sellers who were not bound by a support agreement (the "**Plan Support Agreement**"), which would obligate its parties to vote their claims in favor of the Plan.

DISH's actions and intent may be observed and inferred from the circumstances and its own documents. DISH purchased its debt at par—*paying* the price for which most other creditors could only hope.[5] DISH thought it was overpaying for debt it acquired in this case, but was willing to make that investment.[6] It was willing to overpay for this investment:

---

4. *See* Rehg Dep. Tr. 27.

5. Strictly speaking, DISH might also recover additional postpetition interest, since the First Lien Debt was fully secured. Understandably, DISH does not contend that it invested

approximately $40 million for the First Lien Debt to secure a few months' interest.

6. Rehg. Dep. Tr. 53.

Because we have an interest generally in spectrum assets, and we were interested in having a relationship with ICO[ [7]] that might allow us to, you know, reach some sort of transaction in the future if that spectrum could be useful in our business.[8]

DISH's acquisition of First Lien Debt was not a purchase to make a profit on increased recoveries under a reorganization plan. Rather, the Court finds that DISH made its investments in the Debtors' First Lien and Second Lien Debts as a strategic investor. One of its documents stated, in a number of bullet points that were part of an "Executive Summary":

DISH has invested [$32.9M] for [$111.6M] of Face Value 2nd Priority Convertible Notes at an average dollar price of [29.5].

The Company is attempting to negotiate a proposal to equitize Bondholders in return for 95% of the restructured ICO N.A. (subject to certain earnouts based on valuation).

We believe there is a strategic opportunity *to obtain a blocking position* in the 2nd Priority Convertible Notes and control the bankruptcy process for this potentially strategic asset.

We are seeking Board approval to invest up to an incremental [$100M] to purchase securities necessary *to gain control of the Unsecured (impaired) Class.*[9]

And another document, similar to but different from the one just quoted, said things similarly but in some respects even more explicitly:

DISH has invested [$32.9M] for [$111.6M] of Face Value 2nd Priority Convertible Notes at an average dollar price of [29.5].

The Company is attempting to negotiate a proposal to equitize Bondholders in return for 95% of a restructured ICO N.A. (subject to certain earnouts based on valuation).

We believe there is a strategic opportunity to obtain the remaining convertible bonds outstanding *in an attempt to convert to equity and acquire control of ICO North America.*

We are seeking board approval for up to [$200M] to acquire the remaining convertible bonds outstanding and *establish control of this strategic asset.*[10]

On July 24, 2009, the Debtors filed a further amended Plan and related disclosure statement, providing additional disclosure, addressing others' objections, and providing an updated term sheet for the Amended Facility. On July 27, 2009, the Court approved the Disclosure Statement, over DISH's objection, and thereafter the Debtors began soliciting votes on the Plan.

DISH voted all of its claims, including all of its First Lien Debt and Second Lien Debt claims, to reject the Plan. With a

---

7. Debtor DBSD North America, Inc. was formerly known as ICO North America, Inc., and sometimes referred to as "ICO" or "ICO N.A." It was and is a subsidiary of nondebtor ICO Global Communications (Holdings) Limited.

8. Rehg. Dep. Tr. 53.

9. Doc. DISH–002863 (brackets in original; emphasis added). While the language just quoted, and that in the following passage,

appeared in documents that were produced to opposing counsel as "Highly Confidential, For Attorneys' Eyes Only," the Court sees nothing in the quoted matter that is properly subject to protection under section 107(b) of the Code, and believes that the public interest in this motion affirmatively requires disclosure.

10. Doc. DISH–002189 (brackets in original; emphasis added).

single exception,[11] all other impaired classes in which votes were cast voted to accept the Plan.

In response to DISH's rejection of the Plan, the Debtors filed a motion seeking to designate DISH's vote of its First Lien Debt to reject the Plan.[12] In its objection to such motion DISH noted, among other things, that its conduct was that of a "model bankruptcy citizen" and that it "has not moved to terminate exclusivity, and it has not proposed a competing plan."[13] But on the morning before the scheduled confirmation hearing, September 21, 2009, DISH filed a motion seeking an order terminating the Debtors' 180 day exclusivity period for obtaining approval of the Plan and for authority to propose a competing plan.

DISH has made a proposal to enter into a major transaction with the Debtors, the specifics of which are inappropriate for disclosure in this public document. It is sufficient, for the purposes of this discussion, to say, and the Court finds, that DISH's proposal went far beyond the treatment of the First Lien Debt that DISH had recently acquired. DISH's proposal further evidences its strategic objective.

Based on the totality of the evidence, the Court finds DISH's efforts to understate its intent, as in some of its deposition testimony and counsel's argument, unpersuasive. The Court finds that DISH made its investment in this chapter 11 case, and has continued to act, not as a traditional creditor seeking to maximize its return on the debt it holds, but as a strategic investor, "to establish control over this strategic asset."

*Discussion*

Section 1126(e) of the Bankruptcy Code provides:

> On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

■ Section 1126(e) is permissive in nature,[14] and a bankruptcy judge has discretion in designating votes.[15]

*I.*

■ Neither the expression "not in good faith," nor "good faith" itself, is defined in the Bankruptcy Code. Instead these concepts have been left to caselaw.[16] That

---

11. Unsecured creditor Sprint Nextel Corporation ("**Sprint**") (a holder of a disputed unsecured claim against Debtor New DBSD Satellite Services G.P., which was temporarily allowed for voting purposes) voted against the Plan, and this resulted in the rejection of the Plan by Class 5(H), the class in which Sprint's claim resided.

12. Although DISH voted its Second Lien Debt to reject the Plan as well, its dissenting vote was insufficient to cause a rejection of the Plan by the Second Lien Debt class. Thus designation of DISH's voting with respect to the Second Lien Class would be academic, and presumably was not sought for this reason.

13. DISH Objection, at 2.

14. "... the court *may* designate ...." (emphasis added).

15. *See Century Glove, Inc. v. First American Bank of New York,* 860 F.2d 94, 97 (3d Cir. 1988) (Explaining that section 1126(e) "grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith' ").

16. *In re Dune Deck Owners Corp.,* 175 B.R. 839, 844 (Bankr.S.D.N.Y.1995) (Bernstein, C.J.) ("*Dune Deck Owners*"). *See also In re Landing Assocs., Ltd.,* 157 B.R. 791, 802 (Bankr.W.D.Tex.1993) (Leif Clark, J.) ("The term 'good faith' as used in [section 1126(e)] was intentionally left undefined, so that it

caselaw goes back to cases under Chapter X of the former Bankruptcy Act,[17] section 203 of which provided for similar relief [18] and from which the present section 1126(e) emerged.[19] Under the caselaw, as Chief Judge Bernstein observed in *Dune Deck Owners*,[20] and this Court observed in its earlier vote designation decision in *Adelphia*[21] (drawing upon *Dune Deck Owners* repeatedly), "bad faith"—*i.e.*, an absence of the requisite good faith—may be found where a claim holder attempts to extract or extort a personal advantage not available to other creditors in the class, or, as relevant here, where a creditor acts in furtherance of an ulterior motive, unrelated to its claim or its interests as a creditor.[22]

▇ In the latter connection, each of Chief Judge Bernstein in *Dune Deck Own-* ers and this Court in *Adelphia* observed that courts have developed several "badges of bad faith" which may justify disqualification. They include efforts to:

(1) assume control of the debtor;

(2) put the debtor out of business or otherwise gain a competitive advantage;

(3) destroy the debtor out of pure malice; or

(4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize.[23]

The preeminent case with respect to the first of the badges of fraud—efforts to assume control of the debtor—is *Allegheny*.[24] There a plan proponent, Japonica Partners ("**Japonica**"), bought up claims against the debtor, at increasing prices

---

might be defined and developed in accordance with cases as they arose.").

**17.** One of those cases, *In re P–R Holding Corp.*, 147 F.2d 895 (2d Cir.1945) ("*P–R Holding*"), was decided by the Second Circuit. In that case, the debtor owned a hotel in New York City. Various plans of reorganization were submitted, including one that included an offer made by two individuals to purchase the hotel. Shortly before the last day to vote on the plan, and to assure the success of the plan, they purchased a significant portion of the claims, most of which had been voted against the plan by the sellers. The Second Circuit held that the purchases were made in bad faith, and thus that their votes could not be voted in favor of the plan. Before so concluding, the Second Circuit stated:

The mere fact that a purchase of creditors' interests is for the purpose of securing the approval or rejection of a plan does not of itself amount to "bad faith." When that purchase is in aid of an interest other than an interest of a creditor, such purchases may amount of "bad faith" under section 203 of the Bankruptcy Act.
*Id.* at 897.

**18.** Section 203 then provided:

If the acceptance or failure to accept a plan by the holder of any claim or stock is not in good faith, in the light of or irrespective of the time of acquisition thereof, the judge may, after hearing upon notice, direct that such claim or stock be disqualified for the purpose of determining the requisite majority for the acceptance of a plan.
See 6 *Collier on Bankruptcy* ¶ 9.21 (14th Ed. 1978) (that being the final edition of *Collier* covering the now superseded Bankruptcy Act).

**19.** *See* 7 *Collier on Bankruptcy* ¶ 1126.03[4] (15th Ed. Rev. 2009) This latter edition of *Collier on Bankruptcy* ("*Collier*"), a new version of which will be forthcoming shortly, is presently the latest edition covering the present Bankruptcy Code.

**20.** *See Dune Deck Owners*, 175 B.R. at 844–845.

**21.** *See In re Adelphia Communications Corp.*, 359 B.R. 54 (Bankr.S.D.N.Y.2006) (Gerber, J.) ("*Adelphia*").

**22.** *Dune Deck Owners*, 175 B.R. at 844; *Adelphia*, 359 B.R. at 61.

**23.** *Dune Deck Owners*, 175 B.R. at 844–845; *Adelphia*, 359 B.R. at 61.

**24.** *See* n.3, *supra*.

(and indeed after the debtor had filed a plan of reorganization), to gain control of the reorganized debtor and to block confirmation of an alternative plan that would deny Japonica the opportunity to acquire the control for which Japonica had acquired its claims.

The *Allegheny* court ruled under section 1126(e) that Japonica's purchase of its claims was not in "good faith," and the court disqualified the Japonica vote against the debtor's plan. The *Allegheny* court observed, not surprisingly, that "[t]he particular claims that Japonica purchased, and the manner in which they were purchased, can be used to determine their intent." [25] And it found that Japonica did not acquire most of its claims until a plan had been proposed (and, indeed, a disclosure statement with respect to that plan had been approved); "knew what it was getting into when it purchased its claims"; was a "voluntary claimant"; and that if Japonica "was unsatisfied by the proposed distribution, it had the option of not becoming a creditor," and could have proposed its plan without buying these claims." [26]

Based on the evidence before it, the *Allegheny* court found that "Japonica's interest is to take over and control the debtor" [27]—a purpose fundamentally different than the understandable desire of any creditor to maximize the recovery on its claim. These were acts "in aid of an interest other than an interest as a creditor." [28] Noting that "[v]otes must be designated when the court determines that the 'credi-

tor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position,' " the Allegheny court ruled that the purpose to take over the debtor was such an "ulterior motive," warranting vote disqualification. [29]

The *Allegheny* situation, the first listed of the badges of fraud as discussed by Chief Judge Bernstein in *Dune Deck Owners* and by this Court in *Adelphia*, has long been understood by the bankruptcy community to warrant vote designation. *Collier* recognizes the ability of creditors to vote "selfishly" to maximize the recovery on their claims, [30] and to act in their economic interest, "as long as the interest being served is that of a creditor as creditor, as opposed to creditor in some other capacity." [31] But *Collier* goes on to expressly state:

> "On the other hand, a vote to block a reorganization plan in order to acquire the debtor company for one's self may justifiably result in disqualification of the vote." [32]

## II.

■ Here this is a classic case for application of the *Allegheny* doctrine. DISH's actions in this case, and its documents, demonstrate that DISH did not purchase and vote its claims in order to gain financially by way of a distribution in this case. Rather, as DISH's actions and documents make clear, its purpose was as a strategic investor—and, it may fairly be inferred, to use status as a creditor to provide advan-

---

25. *Allegheny*, 118 B.R. at 289. For example, the claims were acquired at prices as high as 950 on the dollar.

26. *Id.* at 289.

27. *Id.* at 289.

28. *Id.* at 289 quoting P–R Holding.

29. *Id.* at 290.

30. 7 *Collier* ¶ 1126.06[2].

31. *Id.* at ¶ 1126.06[1].

32. *Id.* at ¶ 1126.06[2].

tages over proposing a plan as an outsider, or making a traditional bid for the company or its assets.

First, as the Court has found, and even more egregiously than Japonica did in *Allegheny*—where Japonica made its purchases at a maximum of 95¢ on the dollar—DISH purchased *all* of the First Lien Debt *at par*, knowing that the Plan proposed replacing the First Lien Debt with an Amended Facility that DISH did not want.[33] As this Court stated in its oral ruling, paraphrasing points made to it in argument,[34] "you can't do much better than get par."[35] In fact, Robert Rehg, DISH's Senior Vice President of Corporate Development, admitted that "there was no determination made that it made financial sense to buy this debt."[36] DISH's purchase of the First Lien Debt at par even exceeds the 950 maximum that Japonica paid for the debt it acquired in *Allegheny*.

When an entity becomes a creditor late in the game paying 95¢ on the dollar (as in Japonica), or 1000 on the dollar, as here, the inference is compelling that it has done so not to maximize the return on its claim, acquired only a few weeks earlier, but to advance an "ulterior motive" condemned in the caselaw. DISH's purpose, of course, was not that of the typical creditor—either a victim of financial distress left holding the bag when a debtor fails, or even an

investor in distressed debt seeking to profit from the spread between its purchase price for the distressed debt and its ultimate distributions under a plan.

Second, the surrounding circumstances further demonstrate the similarity of this case to *Allegheny*. Like Japonica, DISH acquired claims after the Debtors proposed a plan of reorganization. Also like Japonica, DISH acquired claims that would give it voting power to resist the Debtors' reorganization efforts. DISH did so with the First Lien Debt, and when DISH bought its Second Lien Debt, it did so avoiding the purchase of any Second Lien Debt claims that were subject to the Plan Support Agreement, even though they would receive the same distributions that any other Second Lien Debt claims would.[37] Unlike Japonica, however, DISH did not stop when it acquired the minimum claims necessary for a blocking position; DISH acquired *all* of the First Lien Debt.

Lastly, the purpose to acquire debt in this case, and to use voting to advance the effort to take control, is as plain in this case as it was in *Allegheny*. As noted above, in the Court's Findings of Fact, one of DISH's own documents stated

> We believe there is a strategic opportunity *to obtain a blocking position* in the 2nd Priority Convertible Notes and *con-*

---

**33.** Courts in the future can decide whether strategic investors can circumvent the *Allegheny* doctrine if they buy up claims cheaply enough. The Court does not have to decide that here.

**34.** *See* Hrg. Tr. at 21 ("one has to question how you pay par and expect to get a recovery ... given that in many circumstances they're limited to getting full recovery on their claim and nothing more than that").

**35.** *Id.* at 81.

**36.** Rehg Dep., 51:23–25.

**37.** DISH argues that the entities that sold it the First Lien Debt indicated their opposition to the Plan as well, and that in voting against the Plan, it did nothing different than they too would have done. It is possible that the former holders of the First Lien Debt would have voted against confirmation of the Plan, but if they had done so, it would have been for maximizing their recoveries on their claims— a goal they achieved when DISH bought their claims at par. When DISH voted against the Plan, it did in a wholly different context, and for wholly different reasons.

*trol the bankruptcy process for this potentially strategic asset.*

We are seeking Board approval to invest up to an incremental [$100M] to purchase securities necessary *to gain control of the Unsecured (impaired)* Class.[38]

And another stated, even more explicitly:

We believe there is a strategic opportunity to obtain the remaining convertible bonds outstanding *in an attempt to convert to equity and acquire control of ICO North America.*

We are seeking board approval for up to [$200M] to acquire the remaining convertible bonds outstanding and *establish control of this strategic asset.*[39]

Additionally, Rehg admitted that DISH was willing to overpay and did overpay for its claims against the Debtors, "[b]ecause we have an interest generally in spectrum assets, and we were interested in having a relationship with [DBSD] that might allow us to, you know, reach some sort of transaction in the future if that spectrum could be useful in our business." [40] While the Court is doubtful that Rehg's admission fully acknowledged the level of DISH's interest (particularly in light of the DISH proposal that the Court saw *in camera*), the Court need not make an ultimate credibility determination in this regard. It is sufficient, for the purposes of this analysis, to note what Rehg did admit, and (in addition to the surrounding circumstances) what DISH's documents said.

In its objection, DISH asserted that:

DISH Network has been a model bankruptcy citizen. It announced in open Court at the Disclosure Statement hearing that it had a potential strategic interest in the Debtors. Since that time, it has acted strictly within the confines of the bankruptcy process; among other things, it has not attempted to interfere with the Plan Support Agreement between the Debtors and the Ad Hoc Committee of Noteholders, it has not moved to terminate exclusivity, and it has not proposed a competing plan.[41]

But the Court cannot agree that DISH has acted as a "model citizen," or that by not engaging in the acts it mentioned, DISH should be immune from application of the *Allegheny* doctrine. That is especially true here, since within days of saying what it said in its pleading, DISH *did* seek to terminate exclusivity, to propose a competing plan.

To be sure, DISH has not misbehaved as badly as some other investors in chapter 11 cases on this Court's watch—as, for example, one group of distressed debt investors moved for appointment of a trustee knowing that such would cause a default on the Debtors' DIP financing facility and a default on the sale of the company upon which all of the creditors' recoveries would rest, and then those distressed debt investor creditors put their motion on hold pending further plan negotiations. But those creditors were doing so to increase their recoveries as creditors holding long positions in debt—with a combined action and purpose that, while disgraceful, was insufficiently egregious to warrant disqualification of a creditor's vote.[42] Here, by

38. *See* n.9 *supra.*

39. *See* n.10 *supra.*

40. Rehg Dep., 53:17–22.

41. DISH Objection, at 2.

42. That was this Court's holding in *Adelphia. See* 359 B.R. at 56–57. One commentator has observed, without quarreling with this Court's ruling on the merits, that failing to punish, by vote designation, behavior of the type this Court saw in *Adelphia* "is likely to make the Chapter 11 process more contentious in some cases." Douglas, "Disenfranchising Creditors

contrast, DISH has acted to advance strategic investment interests wholly apart from maximizing recoveries on a long position in debt it holds.

Moreover, virtually immediately after DISH noted, in connection with its "model citizen" contention, that it had not moved to terminate plan exclusivity, it did exactly that. Under these circumstances, the Court is unwilling to hold that DISH's failure to act as obnoxiously as creditors in other cases have acted somehow suggests that *Allegheny* should not apply.

## III.

In *Adelphia*, this Court stated that:

> in Chapter 11: In Search of the Meaning of Bad Faith under Section 1126(e)," Pratt's Journal of Bankr. L. 2007.03–7 (Mar./Apr. 2007). Douglas observed:
>
> > The message borne by *Adelphia* is that most kinds of overreaching or overly-aggressive creditor conduct designed to extract greater value, concessions or benefits under a plan may be objectionable, but are not sanctionable under section 1126(e). Given the reality that "distressed" investors involved in chapter 11 cases are more likely than most creditors to play hard ball at the plan negotiating table, *Adelphia* may actually encourage the sort of intractable conduct that the court found to be objectionable and unproductive, yet outside the scope of section 1126(e).
>
> Douglas is unfortunately quite right in this regard, and the Court would encourage Congress to modify the Code to authorize Bankruptcy Judges to designate creditor votes for overly-aggressive and other egregious conduct even when the creditors are trying to increase returns on long positions. But in *Adelphia*, the Court had to rule under the Code and caselaw in their then-existing form.

**43.** *Id.* at 56–57.

**44.** There was a second designation motion in *Adelphia*, directed at distressed debt investor creditors of ACC, one of the *Adelphia* debtors, who had admitted, to another distressed debt investor in an ad hoc committee of ACC bond-

The ability to vote on a reorganization plan is one of the most sacred entitlements that a creditor has in a chapter 11 case. And in my view, it should not be denied except for highly egregious conduct—principally, seeking to advance interests apart from recovery under the Plan, or seeking to extract plan treatment that is not available for others in the same class.[43]

But this Court made those observations in the context of a motion to designate creditors holding long positions[44] in bonds of the various *Adelphia* debtors, who were acting to maximize their recoveries under a plan on the debt they held, and noted exceptions to that general rule that were

holders, that they held *short* positions in the bonds of Arahova Communications, another of the *Adelphia* debtors. There was evidence that they opposed the settlement of interdebtor disputes under the plan (under which debtor Arahova would give up some value to debtor ACC, but not as much as those distressed debt investors desired) as they would profit more from losses of value by Arahova, the debtor in which they held their short positions, than they would by gains in value by the debtor, ACC, where they were long. "[T]hese different incentives led [the two distressed debt investors] to care not only about the total distribution that ACC Creditors would receive but also that the consideration to be received come from the Arahova estate. In other words, over time, I formed the view that, for [the two distressed debt investors], it was not enough for ACC Creditors to 'win' but at the same time Arahova had to 'lose.' " Decl. of [a distressed debt investor officer], dated Dec. 4, 2006.

This second designation motion was withdrawn, when it turned out that those two distressed debt investors' votes against the plan did not make a difference. If the motion had not been withdrawn, and if the evidence the Court heard was not refuted, the Court would have designated their votes in a heartbeat. Profiting from another constituency's pain or from losses to everybody from delay in the case would be a classic example of an unprotected ulterior motive.

not applicable there but are applicable here. Here, by contrast, DISH has indeed sought to advance interests apart from recovery under the Plan—as is evident from, *inter alia,* its purchase of claims at par, and the documents evidencing its strategic purpose, as contrasted to the normal desire of any creditor to be repaid. DISH's conduct is indistinguishable in any legally cognizable respect from the conduct that resulted in designation in *Allegheny,* and DISH's vote must be designated for the same reasons.

### Conclusion

For the foregoing reasons, the Court rules that DISH did not act in good faith when it purchased its claims and voted to reject the Plan, and that its votes should be disqualified. The motion of the Debtors to designate the votes of DISH is granted.