In re William R. MOCK, Debtor.

William R. MOCK, Plaintiff,

v.

HANNET, INC. and Janette O'Hanlon, Defendants.

Bankruptcy No. 95–18946SR.
Adv. No. 95–0937.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 19, 1996.

Edward E. Cohen, Philadelphia, PA, for plaintiff and debtor William Mock.

Walter Konyk, Media, PA, L. Keith Lipman, Media, PA, for defendants Hannet, Inc. and Janette O'Hanlon.

Frederic J. Baker, Asst. U.S. Trustee, Philadelphia, PA.

### OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

This matter involves a heated dispute over the ownership of a 13 acre parcel of land located in Concord Township, Delaware County, Pennsylvania. In addition to the instant adversary proceeding, which is styled *Complaint for Injunctive Relief and Complaint to Avoid transfer of Property Fraudulent Under State Law and for Return of Property*, there are two related motions pending: The first is the Debtor/Plaintiff's Motion for Contempt based on the Defendants' allegedly willful violation of the automatic stay; the second is the Motion of the Defendants Hannet, Inc., and Janet O'Hanlon, styled *Motion to Dismiss Pursuant to Section 1307(c) and 105, or in the alternative for Relief from the Stay under Section 362 and For Expedited Consideration thereof of Hannet, Inc. and Janet O'Hanlon.*

The parties to these proceedings have traded accusations of inequitable conduct with one another throughout, and in this respect each seems at least partially correct. As will be seen, however, the arguments of neither side are such as to engender the Court's unreserved belief in the legitimacy of their cause. A combined evidentiary hearing on all three matters was held March 18, 1996. For the reasons which follow, most of the relief sought by the litigants will be denied. However, this Bankruptcy Case, featuring what is essentially a two party dispute, and which appears moreover to have been filed in bad faith, will be dismissed.

### Background.

The real estate in question was acquired by the Debtor, William Robert T. Mock and his wife, Patricia, in 1991 from the Estate of Florence Mock for the sum of $225,000.00.

Acquisition financing was provided, in part, through a $160,000.00 loan from Sears Mortgage Corporation (now PNC Mortgage Corporation of America). By October of 1993, the Debtor and his spouse, (from whom he had already or would later become estranged) were in default of monthly payment obligations on their mortgage loan. Evidence established that at about that time, or shortly thereafter, the Debtor first expressed an intent and/or undertook efforts to sell the property. These efforts took more definite shape in September of 1995 as a foreclosure sale of the property loomed and the Debtor was placed in contact with Mrs. O'Hanlon. The parties' respective versions of that which ensued vary sharply.

The Debtor contends that after negotiation he verbally agreed to sell O'Hanlon a small portion of land (roughly three 1 acre building lots) located in a corner of the tract. O'Hanlon contends that such a sale was never even discussed and that the parties' negotiations were exclusively for a sale of the entire 13 acre parcel. The purchase price, they agree, was to be assumption of the outstanding mortgage balance plus one dollar. In either event, and as a prelude to their transaction, a deed bearing date of September 10, 1995 was prepared by O'Hanlon reflecting a conveyance of the property from the Debtor and his spouse to the Debtor alone. (Exhibit P–1)

The Debtor's spouse, Patricia, resided at that time in Maryland, so sometime in September 1995, the Debtor and O'Hanlon drove to Maryland to gain the signature of the Debtor's wife on Exhibit P–1. They could not find her however, and returned unsuccessful. The deed thereafter was retained by the Debtor in order to obtain his wife's signature. Sometime thereafter O'Hanlon was told by Patricia Mock that she had signed P–1; O'Hanlon therefore again drove to Maryland to get the deed, this time with her husband and an individual named Bob Orlando. Upon meeting with Patricia Mock, O'Hanlon noticed that her signature on the deed was not notarized. Thus, despite Mrs. Mock's proffer of the same, the deed was left in Maryland with instructions to Mrs. Mock to have her signature notarized.

The next time the deed surfaced was on October 10, 1995 in the offices of an individual named Joel Templin at a "closing" on the realty sale. Mr. Mock arrived, bringing with him the deed marked P–1 which now bore the undated acknowledgment of a Maryland notary public as to the signature of Patricia Mock. The parties agree that the Debtor himself then proceeded to sign the deed marked P–1. An October 10, 1995 notarial acknowledgment of the Debtor's signature on P–1 was then affixed by Pennsylvania notary public Patricia A. O'Hare. That acknowledgement indicates, that both Mr. *and* Mrs. Mock appeared at the time and signed the deed marked P–1 in the notary's presence, something which all now agree did not occur. Despite the Debtor's inference at trial that the latter fact implies a conspiracy of some sort, the Court views it as a simple error on the part of the Pennsylvania notary public, and of little moment beyond that. O'Hanlon contends that the Debtor then signed two additional documents: the first (Exhibit P–2), an agreement for sale of the entire 13 acre tract; the second (Exhibit P–3), a deed conveying that realty to O'Hanlon's corporation, Hannett, Inc.

The Debtor agrees that he signed two additional documents at the closing but is uncertain which documents they were. He "thinks" one was the agreement of sale, but he specifically denies that the other document was the deed marked Exhibit P–3. In this respect, the Debtor suggests that his signature on Exhibit P–3 must have been forged. The Debtor acknowledges that Exhibit P–2 referred to a sale of the entire 13 acre property, a fact inconsistent with his alleged understanding of the transaction. He contends, however, that O'Hanlon verbally insisted that the agreement had to be prepared in that fashion in order for her to assume his mortgage and/or obtain the approval which would be needed for her to purchase a subdivided portion of the property. On this basis, he contends, he signed Exhibit P–2.

Curiously, the agreement of sale provided for settlement on or before October 19, 1995, but not later than December 20, 1995. The Debtor suggests from this that Exhibit P–3 must be a forgery, since arguably it might be illogical for him to execute and deliver a deed of conveyance to the property at the same time as he signed the agreement of sale marked Exhibit P–2. O'Hanlon responds that the agreement of sale was executed simply because it is customary for buyers and sellers of land to have a written agreement, and because the agreement contained the only description of the terms of the parties' transaction.

Following the "closing" both deeds, according to O'Hanlon, were retained by her for recording. On November 13, 1995, both were taken on her behalf to the County Courthouse by Bob Orlando. Exhibit P–1 was received by the Registrar and recorded. Exhibit P–3 however was rejected, apparently because its legal description failed to include an appropriate reference to the deed book and page numbers by which the named grantor in Exhibit P–3 had acquired title to the realty in question. O'Hanlon's agent, Orlando, therefore returned the deed to O'Hanlon, who sometime thereafter caused a paragraph to be inserted in Exhibit P–3, adding the required information as to the recording of the Deed marked Exhibit P–1.

Following the October 10, 1995 "closing," O'Hanlon also sent a letter to David Farrell, a tenant in occupancy at the property under a lease which runs through August 31, 1996. (Exhibit D–3) The letter of October 30, 1995 advised Farrell to henceforth remit his $850.00 monthly rent to O'Hanlon. Consistent with this, November 1995 rent was paid to O'Hanlon, but rents since then have been collected by the Debtor. It appears that O'Hanlon likewise took possession of the balance of the property after the October 10, 1995 closing and began efforts to clear the mass of debris thereon. O'Hanlon has apparently spent approximately $70,000 in this regard to date.

On November 14, 1995 the Debtor filed the present Chapter 13 case. The instant filing, however, was preceded by the Debtor's prior filing on October 19, 1995 of a Chapter 13 case at Docket No. 95–18245. The latter case was ostensibly commenced by the Debtor, *pro se*, in order to halt the scheduled PNC foreclosure sale of the property sched-

uled for October 20, 1995. The initial case was dismissed on November 9, 1995, however, for the Debtor's failure to file required documents.

The Debtor's second bankruptcy case appears to be a continued effort to stave off PNC Mortgage Corp., but it is at least in part also the result of the Debtor experiencing a large degree of seller's remorse over his transaction with O'Hanlon. In this respect, the Debtor's Chapter 13 schedules and statement of financial affairs reflect that he has virtually no debt other than the PNC mortgage and classify the agreement of sale marked Exhibit P–2 as an executory contract. The Debtor's Chapter 13 Plan provides for retention of the property (and by implication rejection of the agreement of sale) with current monthly payments to be made outside of his Chapter 13 plan, and arrearages to be retired through 36 payments of $100.00 per month for a total of $36,000.00. While the foregoing appears to be a simple typographical error, it must be noted that the Debtor's schedule of current monthly income and expense reflects an excess of but $100.00 per month, making it is unclear exactly where the Debtor's mathematical error lies.

Written notice of the Debtor's second bankruptcy filing was provided to O'Hanlon by bankruptcy counsel Edward Cohen, Esquire on November 14, 1995. This letter, Exhibit P–4, expressly stated, *inter alia,* that a second bankruptcy case had been commenced, and requested that O'Hanlon refrain from collecting any future rents and/or entering upon the property, noting the applicability of the automatic stay. O'Hanlon does not dispute receipt of this letter, but she has a different read on the implication of the second bankruptcy filing. Acting, she testified, on the belief that her transaction with the Debtor was completed, she proceeded on November 22, 1995 to record the revised deed marked Exhibit P–3. She then responded to the letter from Debtor's counsel with her own letter of November 24, 1995 (Exhibit P–5) wherein she articulates her views that any rights of the Debtor to the property in question had been extinguished pre-bankruptcy.

O'Hanlon's stance prompted the Debtor's Motion for contempt filed December 6, 1995. This Motion seeks recovery of actual damages, attorneys fees, costs and punitive damages, for violation of the automatic stay pursuant to 11 U.S.C. § 362(h). In this Motion the Debtor notes, *inter alia,* that the deed marked Exhibit P–3 was knowingly recorded by O'Hanlon post bankruptcy and, moreover, that payment of the agreed consideration in the form of a mortgage assumption has never occurred. O'Hanlon's Answer to the contempt motion asserts that the realty is not property of the Bankruptcy Estate under 11 U.S.C. § 541(a). Her accompanying Memorandum of Law stresses that state law defines the Debtor's rights and property as of the commencement of the Bankruptcy case and, in particular, she notes the viability under State law of an unrecorded deed as between the parties thereto. On the strength of these theories O'Hanlon maintains that despite her actions no stay violation occurred.

At the initial hearing on the contempt Motion, the Debtor's counsel expressed his intention to shortly commence the instant adversary proceeding to determine the parties' respective rights in the property. The contempt Motion was thus held over and consolidated with that suit for trial on March 18, 1996. Possession of the realty was apparently restored to the Debtor, however, following the Court's preliminary observations that a stay violation had in all probability occurred. Shortly before trial, the Defendants filed the above referenced Dismissal/Relief from Stay Motion with a request for expedited hearing. While they were technically not scheduled for hearing on March 18, 1996, the issues raised in the Defendants' Motion are all subsumed in or overlap the issues raised in the Debtor's Contempt Motion and/or Complaint. All three pending matters, accordingly, can and will be disposed of herein.

The Debtor's Complaint reiterates the Debtor's allegations of a stay violation, fraud in the inducement, and failure of consideration. The Debtor also seeks to have the realty transfer avoided, apparently under an 11 U.S.C. § 544 theory, or to have the same set aside as an unlawful post-petition trans-

action, presumably under 11 U.S.C. § 549. In addition to the damages already described, the Debtor seeks to enjoin the Defendants from further interference with the property in question and demands the return of various items of personalty allegedly removed from the property by the Defendants. The Defendants' answer to the Complaint mirrors their answer to the Debtor's Contempt Motion but adds, as affirmative defenses, allegations of waiver, estoppel, failure to state a claim upon which relief can be granted, and a puzzling final claim that the "Debtor's chapter 13 plan is not confirmable and as a matter of law Debtor cannot be a party to this action."

**Discussion.**

■ As noted, neither party to this dispute can lay claim to sole possession of the equities. On par, however, the Defendants fair considerably better than the Debtor. In this respect, the Court finds that much of the Debtor's testimony was utterly lacking in credibility. To begin with, the Court rejects the Debtor's version of the dealings with O'Hanlon which preceded his Bankruptcy filing. Specifically, the Court concludes that the proposed transaction between the parties did in fact contemplate conveyance of the entire 13 acre property. Weighing in favor of this interpretation of events is the fact that the proposed sale price was to be assumption of the PNC mortgage. The Court notes that PNC Mortgage Corporation has filed a claim in this case in the amount of $226,037.77. The Debtor, it will be recalled, purchased the entire property in 1991 for $160,000.00. The Debtor's suggestion that O'Hanlon agreed to paid him over $226,-000.00 for a 3 acre portion of the property, located in what testimony established to be a remote, inaccessible corner thereof, is implausible, particularly since evidence likewise established that the property suffers environmental contamination and is littered with thousands of tires, old vehicles, used acetylene cylinders, and other debris. This decrepit, but undisputed, portrait of the property hardly supports the inference of a sharp rise in the property's value which is implied in the Debtor's version of events. The Court notes, too, the plain text of the agreement of sale which provides for conveyance of the entire property, the absence therein of any reference to subdivision of the property, and the Debtor's rather thin explanation for why, despite these facts, he proceeded to sign Exhibit P-2.

The Court similarly rejects the Debtor's allegation of a forgery as to his signature on Exhibit P-3. Apart from the fact that the signatures on Exhibits P-1, P-2, and P-3 all appear identical, there was rather damning testimony on this point from both Joel Templin and notary Patricia O'Hare, each of whom testified not only that they witnessed the Debtor execute Exhibit P-3, but that the deed was actually read to the Debtor before he signed it. The Debtor's observation that it is unlikely that both the deed and the agreement of sale would have been executed by him on the same day is unpersuasive. In this respect, O'Hanlon's explanation that an agreement was needed to memorialize the terms agreed to by the parties makes perfect sense. Moreover, it is not uncommon for deeds to be executed and held in escrow pending the completion of conditions specified in an agreement of sale. An important condition still pending on October 10, 1995 was O'Hanlon's obligation to assume the Debtor's mortgage with PNC. That undertaking could almost certainly have been expected to take some time to accomplish. As seen, this condition of sale had not in fact been resolved by October 20, 1995, making it necessary, in the Debtor's view, for him to commence his initial bankruptcy case in order to stop PNC Mortgage Corporation's foreclosure sale. Turning to this latter point, the Court notes also that while a bankruptcy filing to forestall a foreclosure sale is not an uncommon scenario, the circumstances of the Debtor's initial filing cast further unfavorable light on him. Specifically, evidence established that the petition which commenced the Debtor's first bankruptcy case was actually prepared and signed by Bob Orlando. The petition in the first case contains both an incorrect social security number for the Debtor and an incorrect address. No filing fee was ever paid, no supporting schedules were ever filed, nor were any extensions of time sought. The Court finds the Debtor's first Bankruptcy filing to bear convincing

indicia of bad faith. Testimony tended to confirm, moreover, that the Debtor's second bankruptcy case was commenced only upon the Debtor's learning that through serial bankruptcy, filings it was potentially possible for a debtor to retain title to real property for years, even after defaulting on mortgage indebtedness. The second Petition, likewise, was never signed by the Debtor. Rather, his counsel signed it for him, *without attribution*! The sum of the foregoing factors, coupled with the Debtor's overall evasiveness at trial, and his ill conceived and facially infeasible Chapter 13 plan, overwhelmingly persuade the Court that it is the Debtor's intention to manipulate the "system." It would ill behoove the Court to sanction such abuse, and indeed it will not. The Debtor's actions and omissions demonstrate a total lack of good faith on his part with respect to these proceedings. The request for dismissal of his bankruptcy case under 11 U.S.C. § 1307(c) will therefore be granted.

■ While perhaps seemingly harsh, it is less than clear that this disposition works true prejudice on the Debtor. As previously noted, the Debtor's effort to undo his transaction with O'Hanlon are premised upon resort to the Bankruptcy Code's strong arm powers. Various courts have held that, despite the language found in 11 U.S.C. § 103(a),[1] a Chapter 13 Debtor's rights in this respect are limited to the sole specific statutory grant of avoidance power found in 11 U.S.C. § 522(h). See: *In re Redditt*, 146 B.R. 693, 697 (Bankr.S.D.Miss.1992); *In re Perry*, 131 B.R. 763, 769 (Bankr.D.Mass. 1991); *In re Tillery*, 124 B.R. 127, 128 (Bankr.M.D.Fla.1991); *In re Merrick*, 151 B.R. 260, 262 (Bankr.D.Idaho 1993); *In re Carter*, 2 B.R. 321, 322 (Bankr.D.Colo.1980); *In re Willis*, 48 B.R. 295, 298–99 (Bankr. S.D.Tex.1985); *In re Jernigan*, 130 B.R. 879, 887 (Bankr.N.D.Okla.1991); *In re Driscoll*, 57 B.R. 322 (Bankr.W.D.Wis.1986); *In re Radziunas*, Bankr.E.D.Pa., 95–12104 Slip Opinion, dated December 22, 1995 (Sigmund J.). As noted, *in In re Radziunas*, other courts have held that Chapter 13 Debtors have broader rights. See *In re Freeman*, 72 B.R. 850 (Bankr.E.D.Va.1987); *In re Boyette*, 33 B.R. 10 (Bankr.N.D.Tex.1983). Even these Courts, however, condition the Chapter 13 Debtor's resort to the Code's strong arm powers on a showing that the benefit to be derived therefrom will inure to persons other than the Debtor. See *In re Chapman*, 51 B.R. 663, 666 (Bankr.D.D.C.1985). The Debtor's argument fails when tested in this fashion. Other things being equal and absent this bankruptcy case, O'Hanlon is correct that state law would uphold the validity of the October 10, 1995 deeds as between the partners thereto. The Debtor, meanwhile, has only *de minimus* debt other than his mortgage. The rights of the mortgagee, PNC are not at risk by virtue of the Debtor's deed to Hannett, Inc. Rather, the corporation is merely a terre tenant whose title can be divested through foreclosure just as the Debtor's. Resort by the Debtor to the Bankruptcy Code's avoidance powers for the purpose of undoing his deed to O'Hanlon thus stands to benefit the Debtor alone. The instant case accordingly does not require this Court to reach a conclusion as to the general availability of Bankruptcy Code avoidance powers to a Chapter 13 debtor. Rather, the Court need only, and does, adopt the view that in circumstances such as those *sub judice*, recourse to the avoidance powers which the Debtor would invoke is unavailable to him. Dismissal of his bankruptcy case consequently will do little to change whatever is to be the Debtor's inevitable fate.

■ All of the Court's criticism, however, is not reserved for the Debtor. The Court notes that it is unclear to what degree the participation of Orlando in the Debtor's first sham bankruptcy filing can be attributed to O'Hanlon, whose agent Orlando appears to have been at all relevant times. The Court suspects that the first Bankruptcy filing was at least encouraged if not instigated by O'Hanlon who perhaps discovered that it would take longer than ten days for her to negotiate an assumption of the Debtor's PNC mortgage. It seems clear, furthermore, that

---

**1.** **§ 103 Applicability of chapters.**
  (a) Except as provided in section 1161 of this title chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title.

the Debtor has made out a case of violation of the automatic stay on the part of O'Hanlon. Even if the Debtor's interest in the real property as of the date of the commencement of his second bankruptcy case in fact consisted of no more than bare legal title, that interest constituted property of the bankruptcy estate, such that O'Hanlon's post bankruptcy actions in recording the deed marked P–3 contravened the provisions of 11 U.S.C. § 362. See 11 U.S.C. § 541(d). O'Hanlon's November 24, 1995 letter of indignation, wherein she argues that she was not subject to the stay, is of little relevance in this respect, as the scope of the automatic stay under § 362 of the Bankruptcy Code is hardly limited only to those who accept its applicability. The Court is skeptical, moreover, that O'Hanlon, as a self-described "experienced real estate person," genuinely believed that her post bankruptcy self help actions were insulated from the broad reach of the bankruptcy stay. More likely, O'Hanlon was simply intent upon creating *a fait accompli* as a means to overcome the Debtor's protests. The Debtor's request for sanctions based on O'Hanlon's stay violation will therefore be granted, but only in such amount as will reimburse the Debtor's reasonable attorneys fees and expenses occurred in the adjudication of the Contempt Motion. An accompanying Order will direct that the parties attempt to amicably reach agreement on the appropriate payment however, barring their ability to do so, a follow-up hearing will be scheduled prior to the time this case is closed for the purpose of resolving that matter.

■ This disposition hardly resolves all issues between the parties. Where, one might ask, does this leave them? Dismissal of the Bankruptcy case will of course permit PNC Mortgage Corp. to revive its pending foreclosure suit. In this respect, the Court notes that O'Hanlon has yet to pay the stated consideration for sale of the Property. This Court has no view on her ability to assume the PNC mortgage, and similarly takes no position on her right to do so as of this date. The parties are left to their state law rights and remedies as to those matters. In view of the fact that the purchase price remains unpaid, however, the Court concludes that it would be unfair to fully restore the prebankruptcy *status quo* by directing that possession of the real property be returned to O'Hanlon. No such relief will therefore be granted.

An appropriate Order will be entered herewith.

## ORDER

**AND NOW,** this day 19th of April 1996, for the reasons set forth in the within Opinion, it is hereby:

**ORDERED,** that the Debtor's *Complaint for Injunctive Relief and Complaint to Avoid transfer of Property Fraudulent Under State Law and for Return of Property,* be and hereby is DENIED, and it is further:

**ORDERED,** that the Debtor's Bankruptcy Case be and hereby is DISMISSED, and it is further:

**ORDERED,** that the Debtor's Motion for Sanctions pursuant to 11 U.S.C. § 362(h) against Defendants Hannet, Inc. and Janet O'Hanlon be and hereby is Granted, in part. The Debtor is hereby awarded, and Defendants Hannet, Inc. and Janet O'Hanlon are hereby sanctioned and ordered to pay an amount equal to the reasonable costs and attorneys fees incurred by the Debtor in connection with the prosecution of the Debtor's Contempt Motion. The parties are directed and encouraged to endeavor to amicably agree on the amount in question, however, against the event of their inability to do so, a follow-up hearing in the instant matter shall be and hereby is scheduled for Monday, May 13, 1996 at 9:30 A.M., Courtroom No. 3, 2713 U.S. Courthouse, 601 Market Street, Philadelphia, Pennsylvania, 19106.